Filed 10/27/20  In re A.S. CA2/6

# NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## SECOND APPELLATE DISTRICT

## DIVISION SIX

| | |
|---|---|
| In re A.S. et al., Persons Coming Under the Juvenile Court Law. | 2d Juv. No. B304542 (Super. Ct. No. 18JD-00213) (San Luis Obispo County) |
| SAN LUIS OBISPO COUNTY DEPARTMENT OF SOCIAL SERVICES,<br><br>    Plaintiff and Respondent,<br><br>v.<br><br>M.S.,<br><br>    Defendant and Appellant. | |

M.S. (Mother) appeals from the juvenile court's orders (1) denying her petition to change the order terminating her reunification services and reducing her visits with her

children, A.S., E.M., and C.T. (Welf. & Inst. Code,[1] § 388), (2) selecting a permanent plan of guardianship for A.S. (§ 366.26), and (3) terminating her parental rights and selecting an adoption plan for C.T. (*ibid.*).  We affirm.

### FACTUAL AND PROCEDURAL HISTORY

In June 2018, San Luis Obispo County Department of Social Services (the Department) filed a petition alleging that Mother failed to protect her children.  (§ 300, subd. (b).)[2]  The petition alleged that A.S. said that Mother "used to pull her hair," "pinch her," and "used to hit [her and E.M.] worse than now." E.M. said Mother "hit him . . . with a hanger and it broke on him."  Mother tested positive for amphetamine and THC and was "verbally aggressive" towards staff at C.T.'s birth.  The hospital reported that during her pregnancy, Mother requested narcotics for her asthma attacks.  When the hospital refused, Mother became "physically assaultive toward" hospital staff and had "aggressive outbursts and started throwing things at the charge nurse."  After C.T.'s birth, Mother would "vacillate from angry and aggressively yelling to calm" and could not "'manage her emotions.'"

The petition also alleged the children suffered or were at risk of suffering serious emotional damage due to Mother's conduct.  (§ 300, subd. (c).)  The petition alleged that A.S. was suicidal and that she stated "she would not be safe if she was to go home with her mother."  A.S. said she was "very depressed" and "'would harm [herself]'" if she was returned to

---

[1] Further unspecified statutory references are to the Welfare and Institutions Code.

[2] The children's fathers are not parties to this appeal.

Mother's care.  A.S. said that Mother "'curses at [her]'" and tells her that she "'doesn't want [her].'"  A.S. and E.M. reported that Mother isolated them from their extended family and did not allow them to speak to law enforcement, school personnel, or social workers about their safety.

Mother's prior child welfare history included 21 referrals from January 2008 to June 2018; two of which were substantiated.  In November 2010, methamphetamine was found in the home "in easy reach" of E.M.  Mother participated in a one-year voluntary child welfare case, including drug and alcohol education classes, mental health counseling, and family studies classes.  In March 2016, the Department received a referral alleging general neglect of A.S. and E.M.  Mother appeared "depressed," slept "all the time," did not "feed [her] children appropriately," and used marijuana regularly.  Mother did not attend to E.M.'s medical or educational needs, and A.S. stated she did not want to live with Mother.

### *Jurisdiction/Disposition Report and Hearing*

In the jurisdiction/disposition addendum report, the Department noted that Mother "freely admitted that she has a substance abuse problem and she has begun addressing her mental health issues as well."  Mother began a "[dual] diagnosis program with both Drug and Alcohol Services (DAS) and Behavioral Health, as well as engaging in other services provided to her."

At the combined hearing, the juvenile court sustained the third amended petition and declared the three children dependents of the court.  It ordered the children to remain in the custody of their maternal aunt and uncle.  It ordered reunification services for Mother and supervised visits of two

3

hours per week subject to the Department's discretion to increase visits.

### *Three-Month Interim Report and Hearing*

The three-month interim report stated Mother was not complying with her case plan. During a meeting with a social worker and DAS counselors, Mother denied having mental health issues and said she was not taking her medication. The report noted that Mother completed parenting education classes, but parenting guidance sessions were discontinued because of her "'lack of cooperation and inability to accept any feedback that was given.'" The report stated Mother participated in DAS group sessions, but had a "difficult time getting along with her [DAS] counselors." Mother also refused to participate in a treatment program, until she was given a warning.

At the three-month review hearing, Mother reported that she recently found her own housing, full-time employment, and a mental health and drug and alcohol counselor.

### *Six-Month Report and Hearing*

In the six-month report, the Department recommended the children remain in out-of-home care and continued family reunification services for Mother. Mother was in compliance with her case plan; "[h]owever, she has often struggled with receiving feedback and in working with service providers in a meaningful way." The report observed Mother "made a lot of progress" since her three-month report, but it was "difficult to assess how much of this progress [could] be attributed to new skills being developed and how much [was] the result of her simply being removed from her triggers."

4

At the six-month hearing, the court continued Mother's reunification services and gave the Department discretion to allow unsupervised visits.

### Twelve-Month Report and Hearing

In the twelve-month report, the Department recommended the court terminate reunification services for Mother with respect to all three children.

The report stated that after the six-month hearing, Mother "began to struggle." In January 2019, she canceled three visits and asked to reschedule one visit. She was "resistant" to drug and alcohol treatment. The Department informed her that in order to approve unsupervised visits, it needed to assess her ability to manage her anger, and group sessions would be an opportunity to do so. Mother agreed to attend group sessions, but she did not appear on the first day. Mother also missed four drug tests.

The next month, Mother canceled four visits. Her DAS counselor reported she had not seen Mother for a month and that Mother was at risk of being discharged from DAS.

In March, Mother was late to two visits. In April, Mother admitted a relapse and was late to multiple visits. In May, A.S. reported that she had an unauthorized visit with Mother at her grandmother's house. Mother told A.S. to "keep it a secret."

The report stated that overall, Mother "has failed to accept responsibility or to take ownership of her behaviors and how these behaviors impact her children. As a result, she has not been able to engage with her case plan services in a truly meaningful way." The report further noted that Mother "has not demonstrated that she can manage her needs, as well as the

special needs of her children," and that her consistency with visits was "questionable."

The report stated that the "prognosis for any of these children returning home to any parent is not likely. . . If the children were to go home, they would be at risk of having their mental health and educational needs neglected."

The court terminated Mother's reunification services. The court found Mother's "efforts at this point have come a little late for [it] to make the necessary findings for the extension of reunification services." The court ordered supervised visits of two hours per week.

### The Department's Request to Change Visitation

A month later, the Department filed a section 388 petition to change the court's previous order to reduce visits to once a month for one hour per child. The Department said the reduction "will allow the children to focus on their lives and receive fewer confusing messages that put them in the middle of their mother's problematic life circumstances."

The Department reported that Mother brought an unvaccinated puppy without permission to a visit with her children. The Department also discovered Mother had been texting A.S. since July. During another visit, Mother told her children that she was "'doing everything [she was] supposed to be doing so that [they could] come home in November.'" The caregiver reported that A.S. and E.M. began to "experience some behaviors" and that they "both seem to think that they are going back" to Mother in November. The Department stated that the children's "behaviors are increasing" and that their "ongoing contact with their mother is undermining the stability of their placement." Mother did not take responsibility for her actions.

After a contested hearing, the juvenile court reduced supervised visits to once per month for one hour subject to the Department's discretion to increase visits.

### *Section 366.26 Report and E.M.'s 18-month Report*

In the section 366.26 report, the Department recommended a permanent plan of guardianship for A.S., who was living with her maternal grandmother.  The Department recommended that Mother's parental rights to C.T. be terminated and that C.T. be found adoptable.

The section 366.26 report stated that A.S. "made it abundantly clear that she does not want to be adopted."  A.S. wanted to return to Mother's home, but "her feelings readily change in regard to her mother and other adults in her life."  With respect to E.M., the Department filed an 18-month status report which stated that his father was making progress on his case plan.  It recommended the court order that E.M. remain in the care of his father with six months of family maintenance services.  With respect to C.T., who had lived with his aunt and uncle since birth, "his circumstances in regards to permanency [are] clear."

### *Mother's Request to Change Visitation and Services*

About three months after her services were terminated, Mother filed section 388 petitions to change the court's orders (1) terminating her reunification services and (2) reducing her visits to once a month, for each of her children.  Mother requested an order returning A.S. and C.T. to her care or an order reinstating her reunification services and allowing unsupervised visits of at least once per week for four hours.  In her petition for E.M., Mother requested an order for family maintenance services or an order reinstating her reunification

7

services and allowing unsupervised visits of at least once per week for four hours.

Mother presented evidence to show that she "consistently and actively participated" in her case plan even after her services were terminated. Mother stated that she continued to participate in mental health services, and attached a letter from her counselor. Mother attached a certificate of attendance and a letter from her parenting coach verifying her completion of parenting courses. Mother continued to participate in substance abuse treatment and attached a letter from her DAS counselor.

Mother claimed the requested change would benefit her children. She stated she was meeting all service requirements and was consistent with her visits. She had obtained stable housing, employment, and transportation. She also established a support system. Mother participated in family therapy, where she was able to express her remorse and tell her children "they were not at fault." She obtained information to help her children with their special needs. She alleged that A.S. and E.M. expressed their wish to be with her.

Mother stated she was living with her boyfriend in Bakersfield and was driving over 100 miles to attend visits with her children. She claimed she was managing her mental health, had formed a relapse prevention plan, and was able to manage her schedule better.

The Department recommended that the petitions be denied. It reported that Mother had apparently rescinded her consent to the release of information regarding her mental health and drug and alcohol services. The Department said it was "difficult to ascertain how much stability" Mother attained when

she was working alone without her children.  Moreover, despite her recent progress, Mother "has not yet demonstrated her ability to stay clean and sober, establish a job and residence, or be able to care for one or more of her children on a consistent basis."  It also noted the "chaos and confusion between the children and their placements lessened when visitation was changed to once a month."

E.M. was reunified with his father and they were receiving family maintenance services.  E.M.'s aggressive behaviors had lessened, and he was doing well in school.  The father was meeting E.M.'s needs.  The Department stated that reinstating Mother's services or increasing visits "would likely cause confusion for [E.M.] at this point."

The Department stated C.T. "deserves the stability and highest level of permanency through adoption."  The Department found that none of the exceptions to adoption apply.

### Contested Sections 366.26 and 388 Hearing

In January 2020, the juvenile court held a combined sections 366.26 and 388 hearing.  The court denied Mother's section 388 petition.  The court acknowledged Mother's recent progress, but found "these are changing circumstances, and they're not changed."

The court adopted the Department's recommendation for the permanent plan for A.S.  It found that placement with the maternal grandmother was appropriate with a permanent plan of guardianship.  Mother's parental rights were not terminated.

With respect to E.M., the court noted he was in family maintenance with his father, and Mother's parental rights were not terminated.

The court also adopted the Department's recommendation of terminating Mother's parental rights to C.T. The court reasoned that a "young baby with special needs . . . also needs permanency.  The fact is that [C.T.] has been with [his aunt] really from the beginning."

## DISCUSSION

### *Mother's Section 388 Petition*

Mother contends the juvenile court erred when it denied her petition to change the order terminating her reunification services and reducing her visitation schedule with her children.  We disagree.

"A juvenile court order may be changed, modified or set aside under section 388 if the petitioner establishes by a preponderance of the evidence that (1) new evidence or changed circumstances exist and (2) the proposed change would promote the best interests of the child.  [Citation.]" (*In re Zachary G.* (1999) 77 Cal.App.4th 799, 806.)  We review for abuse of discretion.  (*In re Stephanie M.* (1994) 7 Cal.4th 295, 318.)

When reunification services have been terminated and a section 366.26 hearing is set, the focus of the case shifts from the parents' interest in the care, custody, and companionship of the child to the needs of the child for permanency and stability.  (*In re Stephanie M.*, *supra*, 7 Cal.4th at p. 317.)  The child's best interests "are not to further delay permanency and stability in favor of rewarding" the parent for their "hard work and efforts to reunify."  (*In re J.C.* (2014) 226 Cal.App.4th 503, 527.)  To warrant relief under section 388, the evidence of changed circumstances "must be of such significant nature that it requires a setting aside or modification of the challenged prior order."  (*Ansley v. Superior Court* (1986) 185

10

Cal.App.3d 477, 485; see *In re Jamika W.* (1997) 54 Cal.App.4th 1446, 1451.) "A petition which alleges merely changing circumstances and would mean delaying the selection of a permanent home for a child to see if a parent, who has repeatedly failed to reunify with the child, might be able to reunify at some future point, does not promote stability for the child or the child's best interests." (*In re Casey D.* (1999) 70 Cal.App.4th 38, 47.) In assessing the petition, the juvenile court may consider the entire history of the case. (*In re Justice P.* (2004) 123 Cal.App.4th 181, 189.)

The juvenile court did not abuse its discretion. Although she made improvements in the five months after her services were terminated, Mother showed that her circumstances were "merely changing," and not changed. (*In re Casey D.*, *supra*, 70 Cal.App.4th at p. 47.) Throughout her dependency cases, Mother struggled with managing her services and being consistent with her visits. Her three-month report stated she was not complying with her case plan. She denied having mental health issues and refused to participate in some services.

By the six-month hearing, Mother made improvements, but still had issues "receiving feedback and in working with service providers in a meaningful way." Mother then "began to struggle" with meeting her case plan goals shortly after the six-month hearing. Mother refused to participate in services, such as group sessions, missed several drug tests, and canceled or was late to multiple visits. In April 2019, she admitted she relapsed. The twelve-month report stated that Mother struggled with time management, resource management, and accountability.

11

Mother argues she presented evidence that she "made a substantial change of circumstances in her lifestyle including remediation of the issues that led to the removal of the children." However, Mother had a history of having periods of stability that she could not maintain. And as the Department noted, Mother had yet to demonstrate "her ability to stay clean and sober, establish a job and residence, or be able to care for one or more of her children on a consistent basis."

Moreover, there was no evidence of Mother's ability to maintain her stability if visits were increased. As the Department noted, it was "difficult to ascertain" Mother's level of stability that she attained while working alone and without her children, especially considering her prior struggles with time and resource management. This difficulty in monitoring Mother's progress was compounded by her refusal to consent to the release of information from her mental health and drug treatment providers.

It was also unknown how Mother would maintain an increased visitation schedule, given that she had moved to Bakersfield. Although Mother indicated she would find a home in San Luis Obispo County, she did not say how or when.

Mother also did not show that continuing her services or increasing visits would promote the best interests of her children. The evidence shows the children improved after visits were reduced to once a month, and the children were in stable environments, in which their needs were met. Further delays to allow Mother yet another chance to reunify in the future would not be in their best interests. There was no abuse of discretion.[3]

---

[3] Mother argues the court's error in denying her section 388 petition requires reversal of the order terminating her parental

12

### *Beneficial Relationship Exception*

Mother contends the trial court erred when it terminated her parental rights to C.T. because she established the beneficial relationship exception applied.  Her contention lacks merit.

A juvenile court should not terminate parental rights if it "finds a compelling reason for determining that termination would be detrimental to the child."  (§ 366.26, subd. (c)(1)(B).)  Termination will be detrimental if there is a beneficial relationship between a parent and child.  (*In re Bailey J.* (2010) 189 Cal.App.4th 1308, 1314; see § 366.26, subd. (c)(1)(B)(i).)  We review the court's determination for substantial evidence.  (*In re E.T.* (2018) 31 Cal.App.5th 68, 76.)

To show the existence of a beneficial relationship, a parent must prove that: (1) they have "'maintained regular visitation and contact with the child,'" and (2) "'the child would benefit from continuing the relationship.' [Citations.]"  (*In re E.T.*, *supra*, 31 Cal.App.5th at p. 76.)  A parent who has not reunified with an adoptable child may not derail an adoption merely by showing the child would derive some benefit from continuing a relationship maintained during periods of visitation with the parent, or that the parental relationship may be beneficial to the child only to some degree.  (*In re Jasmine D.* (2000) 78 Cal.App.4th 1339, 1348.)  The parent bears the burden to establish that "the relationship promotes the well-being of the child to such a degree as to outweigh the well-being the child would gain in a permanent home with new, adoptive parents."

---

rights to C.T.  Because we conclude the juvenile court did not err in denying the section 388 petition, we need not address this argument.

(*In re Autumn H.* (1994) 27 Cal.App.4th 567, 575.)  The exception applies only in extraordinary cases, because the permanent plan hearing occurs after the court has found the parent is unable to meet the child's needs.  (*In re Jasmine D.*, *supra*, 78 Cal.App.4th at p. 1350.)

Mother did not show that the benefits to C.T. of maintaining a relationship with her would outweigh the benefits of adoption.  It is true that Mother had positive visits with C.T. and C.T. "enjoys his time" with her.  But, frequent and loving contact, an emotional bond, or pleasant visits are insufficient to establish a beneficial relationship.  (*In re Derek W.* (1999) 73 Cal.App.4th 823, 827.)  Mother must show that she occupied a "'parental role'" in C.T.'s life.  (*Ibid.*)  The evidence does not prove this.  C.T. had lived with his maternal aunt and uncle since his birth, and his "primary bond" was with them.  His aunt and uncle provided stability, safety, and comfort to C.T., and he was "strongly attached" to them.

Moreover, Mother did not show that termination of her parental rights would be detrimental to C.T.  Substantial evidence supports the court's finding that the beneficial relationship exception did not apply.

## DISPOSITION

The orders (denying Mother's section 388 petition, selecting a permanent plan of guardianship for A.S., and terminating her parental rights to C.T.) are affirmed.

NOT TO BE PUBLISHED.


TANGEMAN, J.

We concur:

GILBERT, P. J.          PERREN, J.

14

Charles S. Crandall, Judge

Superior Court County of San Luis Obispo

_____

Judy Weissberg-Ortiz, under appointment by the Court of Appeal, for Defendant and Appellant.

Rita L. Neal, County Counsel, Chelsea K. Kuhns, Deputy County Counsel, for Plaintiff and Respondent.