Filed 12/12/18; Certified for Publication 1/10/19 (order attached)

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION THREE

| | |
|---|---|
| In re E.T. et al., Persons Coming Under the Juvenile Court Law. | |
| ALAMEDA COUNTY SOCIAL SERVICES AGENCY,<br><br>     Plaintiff and Respondent,<br><br>v.<br><br>I.T.,<br><br>     Defendant and Appellant. | A153896<br><br>(Alameda County<br>Super. Ct. No. JD02275902) |

Mother, I.T., challenges the juvenile court's denial of her petition that asserted changed circumstances and sought modification of a court order setting a hearing to terminate her parental rights. She also appeals the court's decision to terminate her parental rights with a finding her children are adoptable. This is the rare case where the juvenile court erred in failing to recognize that Mother's relationship with her children outweighed the benefit to the children that would accrue from termination of parental rights and a plan of adoption. Accordingly, we conclude the order terminating Mother's parental rights must be reversed and the case must be remanded for the juvenile court to consider an appropriate long-term plan.

1

Fraternal twins P.T and E.T., a boy and a girl, were first removed from Mother's care by the Alameda County Social Services Agency (Agency) in April 2014 when they were four months old. Mother has a history of mental health issues and drug addiction, and the children were removed when her daughter, E.T., was found unresponsive and not breathing on her living room couch. After more than a year of reunification services, the children were returned to Mother in October 2015 with family maintenance services.

In February 2017, Mother told her social worker during a home visit that she had relapsed into drug use and needed help. The two came up with a safety plan whereby Mother would temporarily place the children with their godparents who had previously served as the foster parents in this dependency. The godparents picked the children up from Mother in March 2017.

Once the children were with the godparents, Mother met with her social worker and service providers in a team decision making meeting. It was agreed that the children would remain with the godparents while Mother got treatment for her addiction. A second team decision making meeting was held a short time later, and Mother was not doing well. She was still using drugs and bickered with one of the children's godparents over her commitment and ability to become sober. Following that meeting, the Agency filed a supplemental petition.

The petition was filed on April 18, 2017, and the children were ordered detained on April 19. A jurisdiction and disposition hearing was held August 9, 2017. The juvenile court bypassed reunification services to Mother because she was previously provided services and reunification was unsuccessful. The court ordered a hearing to terminate Mother's parental rights with a permanent plan of adoption. The Agency was also ordered to arrange visitation for Mother with the children as frequently as possible consistent with their well-being, beginning with one hour per week.

In November 2017, Mother moved to modify the order setting the termination hearing and denying her services. She sought to be reunited with her children or alternatively to be provided services while working toward reunification. The court

ordered the motion for modification to be heard at the same time as the termination hearing.

The hearing began on January 25, 2018. Mother's first witness was the women's program coordinator of Options Recovery Services where Mother was enrolled in an intensive outpatient program. The coordinator had known Mother since 2014 when she began aftercare and drug testing. From 2014 to 2017, Mother had 104 drug tests. Only three of them were positive for drugs. Mother fell out of compliance with the program in March and April 2017, and her last positive tests before the termination hearing began were in June 2017 for alcohol and marijuana. Mother attended substance abuse classes and she completed parenting classes in November 2017. She began attending a 12-week anger management class in December 2017. Mother needs intensive treatment to support her recovery and was attending outpatient treatment for three hours a day, five days each week. She regularly attended her program and absence or tardiness were not problems. Mother was in the beginning stage of her recovery and Options was intending to offer Mother long-term support services.

Mother next called the licensed clinical social worker assigned to her case through the early intervention services program at Children's Hospital. He had known and worked with Mother and the twins for more than two years each Friday for three hours when they were in the process of re-unifying until October or November 2016. In early 2017 he again began working with the family because they had moved back to Alameda from Sacramento and were facing some challenges. After the children were removed from Mother in April 2017, in May the social worker began supervising Mother's weekly visits.

At the beginning, while the kids were eager to see their mom, they were hesitant in some of their interactions with her during the visits. At times when Mother would have a disagreement with one of the kids over a toy or game, it was difficult for her to de-escalate her engagement with the child without help from the social worker. Some point of disagreement or conflict between Mother and the children arose in approximately 75 percent of their visits. But over time, Mother became more reflective and better able to

3

handle such situations. There was never a time when the children were in physical danger because of the way Mother reacted to her differences with them. When they were separated from Mother in March 2017, and shortly thereafter, the kids demonstrated anxiety, uncertainty and fear. Although these feelings improved over time, the uncertainty regarding their permanent living relationship was a persistent source of their anxiety.

Over time the quality of visits improved. The children were easy to engage in activities with Mother and at times expressed a wish to visit longer with her or visit her home in Alameda. The children love Mother. She provides them comfort and affection, and she addresses their fears and anxiety. Permanency in the children's placement will also relieve their anxiety. And both Mother and the foster parents provide consistency in the children's lives.

The child welfare worker assigned to Mother's case since December 2016 also testified. He first met the children when they were living with Mother in Sacramento. At the time he did not have any particular concerns about Mother's interaction with or ability to care for the kids. Shortly after he helped Mother move from Sacramento to new housing in Alameda, Mother told him during a home visit that she had relapsed and needed to get into treatment. Mother and the case worker developed a relapse prevention plan and a safety plan for the children. They agreed the children should be placed with their godparents, who had provided them foster care, while Mother sought treatment for her addiction. A petition was later filed, the children were formally removed from Mother's care and Mother was denied reunification services.

The welfare worker was provided reports of Mother's drug testing from July 2017 until just before the termination hearing resumed in March 2018. All of Mother's drug tests were negative. The welfare worker set up Mother's weekly visits with the children beginning in 2017 and got verbal reports of the visits. Mother has consistently visited with the kids, but all the visits have been supervised and therapeutic. Sometimes following visits with Mother the children were sad and withdrawn and sometimes they

4

would act out. But some of their behavior may have been due to their separation from Mother.

Although Mother was doing well at the time of the hearing, and the Agency thought she should always be a presence in the children's lives, it could not support Mother's petition for reunification or request for more services. The children needed stability and the foster parents were willing to adopt them. It would be difficult for Mother to reunify with the children if they were given six more months of services because the children were experiencing anxiety and concern over where they were going to live and who they were going to live with.

Mother also testified. The twins were born in December 2013 and Mother lived with them in Sacramento until they were four months old. Mother moved from Sacramento because she was afraid of the twins' biological father, and she and the children moved in with the twins' godparents who are the foster parents in this case. The children were first removed from Mother and placed with the godparents in April 2014. Mother participated in reunification services and the children were returned to her care in October 2015. She received family maintenance services for about a year. During that time Mother moved to her mother's home in Sacramento with the children and then back to Alameda in January 2017.

On a typical day in early 2017, Mother would get the kids up and make breakfast before taking them to their Head Start program. The twins would be in the program from 8:30 until 2:30. Mother would pick them up at 2:30 and either go home or to the godparents' home to visit. In the evening Mother would prepare dinner and the children would have some play time while she cleaned up the dishes. Then, the children would have a bath and watch a movie with Mother or she would read to them before bed. If the kids are returned to her, Mother intends to also enroll them in karate classes and basketball because she believes such activities will help the children with controlling their emotions and behavioral issues.

In March 2017, Mother relapsed on methamphetamine and was becoming very impatient. She talked to her assigned social worker and told him she had relapsed and

did not want to lose her children, but she needed help. At his suggestion, she approached the godparents, told them about her relapse and asked if the children could stay with them. The social worker arranged for Mother to enter the Options recovery program. She started the program in July 2017 and was still using drugs at the time. Apart from a positive test for drugs in July 2017, all of Mother's drug tests were negative.

Mother remained in the Options program throughout the proceedings and was still in the program at the time of the March 2018 termination hearing. She regularly participated in Alcoholics and Narcotics Anonymous and classes in life skills, parenting, cognitive behavior, criminal thinking, anger management, acupuncture, and children of alcoholics and addicts.

When she was on drugs, there were times Mother "popped" the children in order to correct their behavior. But she has never lost her temper with the children during any visits, and she does not act that way when she is sober. Mother now re-directs the children and talks with them when they act out or misbehave. In addition to visits, Mother also regularly spoke with the children over the telephone once or twice each week.

Mother brings food to every visit because she knows the children are hungry after a long day at school, and she misses feeding them. They usually play games, talk and eat. Both children smile when they see her, but she knows they may be anxious at the beginning of visits. So, she usually plays peek-a-boo when she first sees them or tries to ease their anxiety in some way. Her son will hold her hand and her daughter will give Mother a spontaneous hug after they warm up.

Mother gave birth to another son in January 2018. The baby lives with Mother and his father helps care for him. The children visited Mother and their baby brother in the hospital shortly after he was born.

Mother understood that her recovery is a life-long process she will need to work at every day. She had a support group around her that includes the children's godparents. She remained in the Options recovery program, was in individual therapy and was going to begin didactic behavioral therapy. The supportive services are very helpful, but

6

Mother feels she could provide for her three children without them. But she thinks it will be hard because she is a single mother.

Mother has had a relationship with the children's godparents for many years, and they provide the children with important support. Even though Mother had a disagreement with one of the godparents who questioned her commitment to sobriety, Mother would not cut off their contact with the children. She believed that doing so would be traumatizing for the kids, and the kids already suffered trauma due to Mother's behavior. She was willing to work on a gradual transition of custody from the godparents, and thought anything too quick would be unrealistic and difficult for the children.

The trial court found Mother to be credible and did not doubt her love for her children or their love for her. But because Mother had shown her ability to refrain from drug use when she was pregnant with the twins, the court placed no weight on Mother's sobriety for the period of the dependency when she was pregnant with her younger son. That was what the court "expect[ed] from Mom. She's shown that before." For this reason the court found no changed circumstances.

The court also found the children were safe and thriving with their godparents. For that reason, the court concluded returning them to Mother would not be in their best interest. So, the motion to modify the order setting the termination hearing was denied.

In a similar vein, the court observed that the children had lived 24 months of their lives with the godparents and only 22 months of their lives with Mother, some of Mother's visits with the children had been difficult, and "although they are very tied to their mother, it's not to such an extent that they can't be happy in their godparents' placement." The court thus concluded that Mother's relationship with the children was not substantial enough to outweigh the children's need for stability with the godparents, and declined to find a beneficial parent-child relationship that would preclude termination of Mother's parental rights. Her parental rights were terminated, and the children were freed for adoption.

Mother appeals.

DISCUSSION

"At a [Welfare and Institions Code] section 366.26 permanency planning hearing, the juvenile court determines a permanent plan of care for a dependent child, which may include adoption. [Citations.] 'If the dependent child is adoptable, there is strong preference for adoption over the alternative permanency plans.' [Citations.] In order to avoid termination of parental rights and adoption, a parent has the burden of proving, by a preponderance of the evidence, that one or more of the statutory exceptions to termination of parental rights set forth in section 366.26, subdivision (c)(1)(A) or (B) apply. [Citations.] The court, 'in *exceptional circumstances,*' may 'choose an option other than the norm, which remains adoption.' [Citation.] The parental benefit exception applies when there is a compelling reason that the termination of parental rights would be detrimental to the child.  This exception can only be found when the parents have maintained regular visitation and contact with the child *and* the child would benefit from continuing the relationship.  (§ 366.26, subd. (c)(1)(B)(i).)" (*In re Anthony B.* (2015) 239 Cal.App.4th 389, 394-395)

"The exception must be examined on a case-by-case basis, taking into account the many variables which affect a parent/child bond.  The age of the child, the portion of the child's life spent in the parent's custody, the 'positive' or 'negative' effect of interaction between parent and child, and the child's particular needs are some of the variables which logically affect a parent/child bond." (*In re Autumn H.* (1994) 27 Cal.App.4th 567, 575-576.)

"We apply the substantial evidence standard of review to the factual issue of the existence of a beneficial parental relationship, and the abuse of discretion standard to the determination of whether there is a compelling reason for finding that termination would be detrimental to the child." (*In re Anthony B.*, *supra*, 239 Cal.App.4th at p. 395)

There is no question here that Mother fulfilled the first component of the beneficial relationship exception.  She visited with the children as often as she was permitted by the social workers, and she also had regular contact with the children by phone in between visits.  While some of the visits were at first difficult, over time Mother

8

became more reflective and was better able to handle disagreements with the children or their misbehavior.

More importantly, the visits coupled with Mother's efforts during the dependency showed that the children would benefit from continuing their relationship with her. They love Mother. She provided them comfort and affection, and she was able to ease their fear and anxiety. Following visits with Mother, the children would sometimes be sad, withdrawn and might act out. But the Agency thought at least some of this behavior was due to their separation from Mother. While the Agency thought Mother should always be a presence in the children's lives, it favored termination of her parental rights because the children needed stability and the godparents could provide it.

But the twins are young. At four years old, they have spent almost half their lives with Mother, and while they have spent slightly more with their godparents, the difference of a couple of months is not so significant here that it would be determinative in favor of termination. As the juvenile court observed, the children are "very tied to their mother."

The record also shows that despite denial of services, Mother continued to participate in programs designed to maintain her sobriety and make her a better parent. She has consistently tested negative for drugs, and during the dependency remained in drug treatment, took classes in life skills, parenting, cognitive behavior, criminal thinking, anger management and children of alcoholics and addicts. Moreover, the insight she has into her own development and the love and care she has for her children was clear in her testimony. Mother recognized that her behavior was traumatic for the children, and she did not want to further traumatize them by abruptly removing them from the godparents' custody. Of any possible transition, Mother testified, "as far as their emotion and their understanding, it would need to be slow." Mother considered the godparents to be the twins' "main support when I have not been available" and that it would be "horrible" for the children if she broke contact with them. "It would not benefit them at all, the twins."

On this record, the court abused its discretion when it declined to find a beneficial relationship exception because the twins' bond to Mother "was not to such an extent that they can't be happy in their godparents' placement." The standard is whether the children benefit from Mother's presence in their lives, not whether they could eventually be happy without her.

Our recognition of the beneficial relationship exception means "the relationship promotes the well-being of the child[ren] to such a degree as to outweigh the well-being the child[ren] would gain in a permanent home with new, adoptive parents. In other words, the court balances the strength and quality of the natural parent/child relationship in a tenuous placement against the security and the sense of belonging a new family would confer. If severing the natural parent/child relationship would deprive the child[ren] of a substantial, positive emotional attachment such that the child would be greatly harmed, the preference for adoption is overcome and the natural parent's rights are not terminated." (*In re Autumn H.*, *supra*, 27 Cal.App.4th at p. 575.) Such is the case here. There is no question that the twins have a substantial and positive attachment to Mother such that terminating their familial relationship would cause them great harm. Even if Mother may not ultimately regain custody, she should not be excluded from the children's lives. "Examining the evidence in the light most favorable to the judgment, we conclude that not only did Mother maintain regular visitation and contact, but she also met her burden of showing a beneficial relationship." (*In re Amber M.* (2002) 103 Cal.App.4th 681, 689.)

Perhaps, given the longstanding relationship between Mother and the godparents, the court considered that the children may have contact with Mother even though her rights were terminated. But "the court cannot nevertheless terminate parental rights based upon an unenforceable expectation that the prospective adoptive parents will voluntarily permit future contact between the child and a biological parent, even if substantial evidence supports that expectation. The purpose of the parent-child relationship exception is to protect the parent-child relationship when its continuation is more beneficial to the dependent child than a permanent plan of adoption and, in such a

10

case, a court cannot leave the protection of such a relationship dependent upon the hoped-for goodwill of the prospective adoptive parents." (*In re C.B.* (2010) 190 Cal.App.4th 102, 128-129.)

Finally, in light of our conclusion that Mother demonstrated the child-parent beneficial relationship exception applies in this case, we will not decide Mother's claim that the court erred when it denied her modification motion. But her argument has considerable prospect for success if raised upon remand unless her and the children's circumstances have significantly changed. Even though Mother was denied services when her children were removed for the second time, she remained in treatment and stayed sober for more than 9 months. While the court discounted Mother's sobriety because she was pregnant and had previously stayed off drugs when she was pregnant with the twins, we would not similarly minimize her accomplishment. We cannot overstate how difficult it must be for an addict to abstain from drugs without help. Mother's effort was entitled to more credit.

So too was her self-reporting that she had relapsed. Mother did the right thing when she informed her social worker that she was again using drugs. She recognized her children were in jeopardy and sought help. She voluntarily placed her children with their godparents and sought treatment. The agency's response when she did not immediately test negative for drugs was to initiate this supplemental petition, remove the children and deny her services. This record leads to a conclusion that her die was cast at that time. But that should not be so. Mother did all she was asked to do and more. In these circumstances, we cannot condone making her pay such a severe price when she has worked so hard to overcome her addiction, acquired such insight into her parental responsibilities and been so attentive to her children's best interests.

## DISPOSITION

The order terminating Mother's parental rights and freeing the children for adoption is reversed. This disposition effectively renders Mother's appeal from the order denying her petition for modification moot, so it is dismissed. The case is remanded for

11

the juvenile court to consider a long-term plan for the children consistent with the views expressed in this opinion.

_____
Siggins, P.J.

We concur:


_____
Jenkins, J.


_____
Fujisaki, J.


*In re E.T. et al*, A153896

Filed 1/10/19

**CERTIFIED FOR PUBLICATION**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION THREE

| | |
|---|---|
| In re E.T. et al., Persons Coming Under the Juvenile Court Law.<br><br>_____<br><br><br>ALAMEDA COUNTY SOCIAL SERVICES AGENCY,<br><br>    Plaintiff and Respondent,<br><br>    v.<br><br>I.T.,<br><br>    Defendant and Appellant. | A153896<br><br>(Alameda County Superior Court No. JD02275902) |

BY THE COURT:

    The opinion in the above-entitled matter filed on December 12, 2018, was not certified for publication in the Official Reports. For good cause, the request for publication is granted.

    Pursuant to California Rules of Court, rules 8.1120 and 8.1105(c)(2), the opinion in the above-entitled matter is ordered certified for publication in the Official Reports.

Dated: ___January 10, 2019__          _____SIGGINS, PJ_____P.J.

Trial Court:   Alameda County Superior Court

Trial Judge:   Hon. Kimberly M. Briggs

Counsel:

Donna R. Ziegler, County Counsel and Samantha N. Stonework-Hand, Deputy County Counsel, for Plaintiff and Respondent.

Liana Serobian of Serobian Law, Inc., under appointment by the Court of Appeal, for Defendant and Appellant.