Filed 3/17/21  In re J.M. CA1/5

## NOT TO BE PUBLISHED IN OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## FIRST APPELLATE DISTRICT

## DIVISION FIVE

| | |
|---|---|
| In re J.M., et al., Persons Coming Under the Juvenile Court Law. | |
| ALAMEDA COUNTY SOCIAL SERVICES AGENCY,<br>    Plaintiff and Respondent,<br><br>v.<br><br>K.M.,<br>    Defendant and Appellant | A161073<br><br>(Alameda County Super. Ct. Nos. JD-021287-02, JD-021288-02, JD-029933-01, JD-029934-01) |

K.M. ("mother") appeals from a judgment terminating her parental rights to J.M., S.L., L.L., and A.L. (collectively "the children").  She contends that the trial court should not have severed her parental rights because the benefits from her relationship with the children outweigh the stability and permanence afforded to them by adoption.  (See Welf. & Inst. Code, § 366.26, subd. (c)(1)(B)(i)).[1]  Because we find no error in the trial court's judgment, we affirm.

---

[1] Undesignated statutory references are to the Welfare and Institutions Code.

1

## A.

In an earlier dependency case, J.M and S.L. were removed from mother's care in July 2013 due to substance abuse, domestic violence, and mental health problems, and were returned to her care in October 2014 after services were provided.

However, mother relapsed and began using methamphetamine again in 2017. In June 2018, the Alameda County Social Services Agency ("Agency") initiated the instant dependency case by filing a petition pursuant to section 300, alleging that the four children have suffered or are at risk of suffering physical harm due to mother's inability to provide regular care for the children as a result of her substance abuse, mental illness, and involvement in domestic violence. At the time the Agency filed the petition, J.M. was seven years old, S.L. was six years old, L.L. was three years old, and A.L. was two years old.

The children were detained when mother was committed to a psychiatric hospital for 72 hours. Mother was committed after she called the children's maternal grandparents and threatened to set her apartment on fire and kill the children if the grandparents did not provide respite care immediately.

The petition alleged that mother had neglected the children's needs due to her long history of methamphetamine addiction, that she had previously been in 15 substance abuse treatment programs, and that she had multiple drug-related arrests. The petition alleged that mother had relapsed and was spending up to four hours a day locked in her room, several times a week, leaving the children without food. As a result, seven-year-old J.M. had to

2

forage for food and care for their siblings,[2] and J.M. and S.L. had to miss school.

The petition further alleged that mother has a mental health disorder that impairs her ability to provide care for the children. The petition referenced mother's threat to set fire to her apartment and kill the children and alleged that mother was diagnosed with bipolar disorder and was not taking appropriate medication.

In addition, the petition alleged that mother has a pattern of involvement in relationships with physically abusive partners who may have also abused the children. The petition alleged that mother's boyfriend had assaulted mother in front of J.M. and had punched J.M. in the chest and stomach, and that a previous boyfriend had grabbed J.M. and bruised both of their arms. Further, the petition alleged that the children had become very violent with each other for no apparent reason.

Finally, the petition alleged that mother disciplined the children by hitting them with a hanger.

The court concluded that allowing the children to remain in mother's home would be contrary to their welfare and ordered the children detained. Subsequently, the court found the allegations of the petition to be true and adjudged the children to be dependents of the court.

**B.**

The court ordered reunification services for mother, but ultimately terminated services after 18 months because she only partially complied with her case plan and thus failed to resolve the concerns leading to the children's removal from her care. Although mother completed a substance abuse

---

[2] Because J.M. uses "they/them" pronouns, this opinion uses such pronouns to refer to J.M.

3

treatment program, she tested positive for amphetamines again two months later and stopped going to her substance abuse aftercare program. Mother also discontinued therapy for a period. In addition, mother attended domestic violence treatment classes, but continued her relationship with her abusive partner and had visible bruising on her face and neck during supervised visits with the children. Although mother's visit plan precluded the presence of her abusive partner, she was repeatedly seen with the abusive partner when she arrived for visits with the children. As mother later testified, "I was actively participating in an unhealthy and unsafe relationship . . . which not only put myself in danger, but also my children. And then I lied about it and . . . told the [social] worker that I was not with [the abusive partner] when in fact I was."

Mother's fifth child, born after J.M., S.L., L.L., and A.L. were detained, was removed from her care a few months before the Agency recommended that the court terminate reunification services in the instant case. The infant reportedly had special needs, had missed several medical appointments, and was severely malnourished. In addition, mother's home was deemed unsafe due to flea infestation and a pattern of domestic violence with her abusive partner.

## C.

For a child who has been adjudged a dependent of the court and cannot be returned to a parent, the court must determine a permanent plan at a section 366.26 hearing. (*In re Anthony B.* (2015) 239 Cal.App.4th 389, 394-395 (*Anthony B.*); see also § 366.26, subds. (a)-(b).) The goal is "to provide stable permanent homes for these children." (§ 366.26, subd. (b).) Adoption, rather than less permanent plans such as long-term foster care or guardianship, is the preferred outcome if the dependent child is adoptable.

4

(§ 366.26, subd. (b)); see also *Anthony B.*, *supra*, 239 Cal.App.4th at p. 395.)

However, the statute specifies circumstances where the court will forgo adoption and retain parental rights. (§ 366.26, subd. (c)(1).) At issue here is section 366.26, subdivision (c)(1)(B)(i), which provides an exception to adoption when "[t]he court finds a compelling reason for determining that termination [of parental rights] would be detrimental to the child" because "[t]he parents have maintained regular visitation and contact with the child and the child would benefit from continuing the relationship." The "parent has the burden of proving, by a preponderance of the evidence," that the exception applies. (*Anthony B.*, *supra*, 239 Cal.App.4th at p. 395.)

The beneficial relationship exception applies where the parent/child "relationship promotes the well-being of the child to such a degree as to outweigh the well-being the child would gain in a permanent home with new, adoptive parents. In other words, the court balances the strength and quality of the natural parent/child relationship in a tenuous placement against the security and the sense of belonging a new family would confer." (*In re Autumn H.* (1994) 27 Cal.App.4th 567, 575 (*Autumn H.*); see also *Anthony B.*, *supra*, 239 Cal.App.4th at p. 396 ["The question is whether that relationship remained so significant and compelling in [the child's] life that the benefit of preserving it outweighed the stability and benefits of adoption."].) Thus, "[i]f severing the natural parent/child relationship would deprive the child of a substantial, positive emotional attachment such that the child would be greatly harmed, the preference for adoption is overcome and the natural parent's rights are not terminated." (*Autumn H.*, *supra*, 27 Cal.App.4th at p. 575.)

At the section 366.26 hearing here, the trial court concluded the beneficial relationship exception was inapplicable, terminated mother's

parental rights, and selected adoption as the permanent plan for the children.

## DISCUSSION

Mother contends that the juvenile court erred in concluding that the beneficial relationship exception is inapplicable. We disagree.

### A.

As an initial matter, the parties agree that we should review for substantial evidence the trial court's determinations as to whether mother regularly visited with the children and whether a beneficial parent relationship existed. (See *Anthony B.*, *supra*, 239 Cal.App.4th at pp. 395-396.) Under that standard, "[w]e determine whether there is substantial evidence to support the trial court's ruling by reviewing the evidence most favorably to the prevailing party and indulging in all legitimate and reasonable inferences to uphold the court's ruling." (*Ibid.*) The parties likewise agree that we should review for abuse of discretion the trial court's determination as to whether the existence of a beneficial relationship constitutes a compelling reason for concluding that termination of parental rights would be detrimental to the children. (See *ibid.*) Under the abuse of discretion standard, we ask whether the trial court's decision was reasonable: " ' " [w]hen two or more inferences can reasonably be deduced from the facts, the reviewing court has no authority to substitute its decision for that of the trial court.' " ' " (*In re Caden C.* (2019) 34 Cal.App.5th 87, 106, review granted July 24, 2019, S255839, 444 P.3d 665 (*Caden C.*).) Although our Supreme Court has granted review in *Caden C.* to address the appropriate standard of review, the result in this case would be the same regardless of whether we review for substantial evidence or abuse of discretion, or apply the hybrid approach agreed upon by the parties. Under either substantial

6

evidence or abuse of discretion review, we must view the record in favor of the judgment, and findings of fact underlying a discretionary determination must nonetheless be supported by substantial evidence. (See *Caden C.*, *supra,* 34 Cal.App.5th at pp. 106-107.)

**B.**

We conclude that the trial court did not err in declining to find that the benefit from mother's relationship with the children outweighed the stability and benefits of adoption.

The court found that mother had established that she had continued to visit the children regularly and took care to bring them multiple activities and books she knew the children would enjoy for each supervised visit. The social worker reported that the children's visits with mother were "relatively consistent" and "positive." The children enjoyed visiting with mother and the visits "benefitted them emotionally." J.M.'s court-appointed special advocate observed that the visits "are good for the child and should continue so that the children can regain trust and bond with" mother. Mother also called the children three to four times a week.

The court also recognized that mother has a beneficial relationship with the children in that "the relationship that she speaks of with the children sounds to me to be something more specific or significant than a basic bond between a separated child from a parent." As the court noted, mother had "parental conversations" with the children; provided detailed testimony about each of the children's special attributes, interests, and challenges; and provided emotional support to the children in challenging situations. The court found that "[t]he children clearly are attached to the mother." According to the social worker, mother has "maintain[ed] a close and affectionate relationship" with the children. The children reported that

7

mother is "one of the most important people" in their lives. L.L and A.L. wanted to be returned to mother's custody, while J.M. and S.L. had conflicting feelings about being adopted.[3]

Given the trial court's findings that mother had visited with the children and maintained a beneficial relationship with them, the court explained that "the only question really is whether or not that bond with the children outweighs the children's need for permanence through adoption." The court concluded that the parental relationship did not outweigh that need for permanence, explaining: "I know enough about this case to know that these little ones have struggled with permanence. Wanting to know where they belong, how they belong. [¶] . . . [¶] [T]heir need . . . for permanency is the thing that I cannot . . . get past." The court observed that

---

[3] Although the trial court did not discuss these facts, we note that there were also negative aspects of the children's experiences with mother, even after the children were removed. For example, when mother was released from the psychiatric hospital early in the dependency, she went to the maternal grandparents' home in the middle of the night and pounded on the window, almost breaking it, and woke the children, causing them to scream and cry. In another incident during the dependency, during a birthday party she planned for L.L, mother grabbed a baseball bat studded with nails and chased her boyfriend's mother around while screaming and yelling. The children were "visibly scared," and S.L. began crying and needed to be consoled. On another occasion, mother reportedly assaulted the maternal grandmother in front of the children, chest-bumping her and punching her in the head several times. When the grandmother called the police, mother began screaming in front of the children that she was going to kill herself. The children cried and pleaded with the grandmother to "please [don't] let mommy kill herself," and S.L. had nightmares afterward. This was not the first time mother had threatened to kill herself in front of the children, as J.M. told the maternal grandmother that mother said she would kill herself if the kids were ever taken away from her. In another incident that occurred in connection with a supervised visit, mother had a disagreement with the maternal grandmother that "upset the children" and made staff and clients at the visit location uncomfortable.

"there's something nagging about the children's need to feel like they belong in one place."[4]

We find no error in the court's weighing of the mother's relationship against the children's need for permanence. Mother emphasizes the strength of her attachment and the quality of the relationship, but largely fails to address the significant concerns about permanence in this case.

The social worker described J.M. and S.L.'s placement history as "disruptive and unstable" because they had been placed in three different foster homes in 2013 and 2014 before being returned to mother's home in their first dependency case. In the instant dependency case, all four children were initially placed with their maternal grandparents, but later moved to a foster home. Ultimately, by the time of the section 366.26 hearing, J.M. and S.L. each had had a total of four placements, and L.L. and A.L., the two younger children, each had had a total of two placements.

In addition, the children experienced disruptions in caregivers while they were residing with mother, before the initiation of the current dependency case. Mother left the children with the maternal grandparents for weeks at a time. The children also experienced periods of time with no effective adult caregiver, as mother reportedly locked herself in her bedroom for hours at a time, several times a week, while using methamphetamines and left L.L. and A.L., who were toddlers at the time, by themselves on the front porch of the house with no adult supervision. The children were not provided with food during such times. On one occasion, when a legal process

---

[4] We reject mother's contention that the court's decision rested on an assumption that the children would continue to have contact with mother even after it terminated her parental rights. Although the court noted the possibility of future contact with mother after adoption, "[t]his [wa]s not really a relevant fact for the Court."

9

server knocked on the door of their home one weekend, the door was opened by the four children, who were reportedly naked; the children exited the home and ran around a parking lot naked while the process server attempted to wake mother. As a result of the lack of adult supervision, J.M. had to forage for food for his younger siblings, A.L. was food obsessed at the beginning of the dependency, S.L. missed most of kindergarten, and J.M. was absent from school for significant periods.

The children also experienced other impacts on their schooling. Mother unenrolled the children from one school when she separated from an abusive boyfriend. After enrolling in a different school in Alameda, J.M. – who has an individualized educational plan due to learning differences – had to change to yet another school in Antioch, where the current foster family resides. Likewise, due to changes in primary caregivers and other disruptions, S.L. attended different schools in Alameda, Fremont, and Antioch. The younger children, L.L. and A.L., also attended school programs in other locations prior to moving to programs in Antioch.

Because of the instability they experienced, the children suffered from separation anxiety and all four required therapy to help them "process[] [their] history of changes in primary caregivers, ruptured attachments and past trauma." At the beginning of the dependency, the children's behavior (hitting, choking, tantrums, enuresis, and nightmares) suggested "significant exposure to traumatizing events." For example, when J.M. was transitioning to the current foster home, they wet their pants after a phone call with mother, were behaving like a three-year-old, tried to choke their foster sibling and themselves, and overall had a difficult time. However, eventually J.M. was able to settle into the new foster home's routines.

10

J.M.'s court-appointed special advocate reported that J.M. "is very concerned about placement changes," that J.M. was "more settled" in the current placement, and that "this sense of security should not be disrupted." S.L.'s advocate observed that S.L. "has been going through a lot of difficult transitions." However, S.L. "increasingly appears to expect that her current foster placement . . . will become her 'forever home.'"

Although the social worker recognized "the emotional impact . . . of parental rights being terminated," given the children's history, she concluded that the children "deserve permanency with committed and able parents, who will meet their needs and provide them with stability, nurturance, and family connections. If parental rights are not terminated and [the children] are not adopted, they could experience disruption in their placement, attachments, and services." J.M. and S.L.'s court-appointed special advocates agreed that adoption would be in the children's best interests,; while L.L. and A.L.'s advocate's report did not address adoption, she recommended they remain in their current placement.

Mother does not address the impacts on the children that have resulted from the numerous disruptions in their young lives. Neither does she dispute that security and permanence are particularly important for the children given their history. Instead, she contends that there is nothing in the record suggesting that the children would lose their placement with their current caregivers if parental rights were not terminated and a legal guardianship ordered instead. However, the social worker reported that the current caregivers were not interested in a guardianship. In addition, the children's maternal grandparents were not an option for a long-term placement, and their maternal grandmother passed away prior to the section 366.26 hearing. Moreover, it is mother's burden to show that permitting the parental

11

relationship to continue alongside a more tenuous plan such as legal guardianship or long-term foster care would be in the children's best interests (*Anthony B.*, *supra*, 239 Cal.App.4th at p. 397), and she may not prevail by pointing to an absence of information in the record and ignoring evidence indicating the children would benefit from consistency, security, and permanency. We thus disagree with mother's contention that the "only" possible inference from this record is that the benefits from preserving the parental relationship outweigh any benefits from the stability and permanence of adoption.

Mother relies on *In re Amber M* (2002) 103 Cal.App.4th 681 (*Amber M.*), but the circumstances there are not analogous. In *Amber M.*, a psychologist who conducted a bonding study concluded that severing the parental relationship " 'could be detrimental' " to the children and the court-appointed advocate disagreed with the recommendation of adoption in light of the "bond and love between" the mother and children. (*Id.* at pp. 689-690.) Further, the social worker – the lone expert advocating for adoption – recommended adoption based on the mother's "current inability to provide a home" for the children and on "the suitability of the current placements" – but neither consideration justified the recommendation. (*Id.* at p. 690.) In addition, the trial court failed to articulate its reasoning. (*Id.* at p. 691.) None of these factors are applicable here. Instead, the trial court's reasoning is consistent with the record, and mother has failed to grapple with it.

We are likewise unpersuaded by mother's reliance on *In re E.T.* (2018) 31 Cal.App.5th 68 (*E.T.*). Although the court there concluded that the mother's "substantial and positive attachment" to her children outweighed the benefits of a permanent home (*id.* at p. 77), the children in that case apparently had resided in only one placement home – that of their

12

godparents – when removed from their mother's care. (*Id.* at pp. 71, 73, 75.) There was no indication that the children in that case had been subjected to multiple out-of-home placements, moved from school to school, or suffered food insecurity. In any event, as *E.T.* emphasizes, the beneficial relationship exception must be analyzed on a " 'case-by-case basis.' " (*Id.* at p. 76.)

In sum, because it was supported by the record and did not exceed the bounds of reason, we affirm the trial court's determination that the benefits of permanence through adoption outweighed the benefits of mother's relationship with the children.

## DISPOSITION

The judgment is affirmed.

_____
BURNS, J.

We concur:

_____
SIMONS, ACTING P.J.

_____
NEEDHAM, J.

A161073

14