Filed 2/11/26  In re X.G. CA4/2

## NOT TO BE PUBLISHED IN OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## FOURTH APPELLATE DISTRICT

## DIVISION TWO

| | |
|---|---|
| In re X.G., a Person Coming Under the Juvenile Court Law. | |
| SAN BERNARDINO COUNTY CHILDREN AND FAMILY SERVICES, | E086881 |
| Plaintiff and Respondent, | (Super.Ct.No. J297636) |
| v. | OPINION |
| A.G., | |
| Defendant and Appellant. | |

APPEAL from the Superior Court of San Bernardino County.  Lynn M. Poncin, Judge.  Reversed and remanded.

Jesse McGowan, under appointment by the Court of Appeal, for Defendant and Appellant.

Laura Feingold, County Counsel, Dawn M. Martin and Helena Rho, Deputy County Counsel, for Plaintiff and Respondent.

1

At a Welfare and Institutions Code section 366.26[1] hearing, the juvenile court terminated the parental rights of defendant and appellant A.G. (mother) as to X.G. (minor, born September 2020).[2] On appeal, mother contends the court erred in declining to apply the beneficial parental relationship exception to termination of parental rights. We reverse and remand.

## I. FACTUAL AND PROCEDURAL BACKGROUND

On June 24, 2023, personnel from plaintiff and respondent, the San Bernardino County Children and Family Services (the department), received a referral alleging that mother had struck minor with an extension cord, pushed him into a wall, and threw him onto the ground leaving welts and bruises on his legs and back. Officers arrested mother for willful harm to a child under circumstances likely to produce great bodily injury. She admitted to an officer that she hit minor with an extension cord. The officer observed welts and bruises on minor's body.

Mother and minor lived with the maternal grandmother. The social worker interviewed the maternal aunt, who said she witnessed most of the incident. The maternal aunt said she was sleeping but awoke to the sounds of mother yelling at minor. She entered mother's room and saw mother hitting minor with a speaker wire causing minor to cry out in pain. The maternal aunt then saw mother push minor into a wall

---

[1] All further statutory references are to the Welfare and Intuitions Code.

[2] The court also terminated mother's parental rights as to minor 2 in case No. J299039. However, mother expressly notes that she is not raising any issues with respect to minor 2. We therefore dismiss as abandoned mother's appeal as to minor 2. (*In re Sade C.* (1996) 13 Cal.4th 952, 994.)

causing him to hit his head. Mother pushed minor to the ground and continued to yell at him.

The social worker interviewed mother, who reported that minor was running around with a knife. She asked him to stop several times, "so I gave him a whooping. I couldn't find my belt, so I used my speaker cord. This is the second time he got a whooping." She described the "whopping" as four hits with the speaker wire. Mother said the bruises on minor were not inflicted by her.

Mother described the previous occasion she had inflicted corporeal punishment on minor: "I whooped him two (2) times with a belt and it wasn't hard." She denied any prior instances of physical discipline or domestic violence in the home.

Father said he would care for minor on weekends.[3] He stated he had observed mother "whoop" minor several times. The most recent incident occurred six or seven months earlier: "I heard [minor] crying and saw her whooping him. I had to stop her. We left for a little bit and then came back. [Minor] was shaking." Father recalled three "'more bad whoopings, when I had to stop her.'" Minor was left shaking and did not want to be around mother anymore. Father denied any domestic violence between he and mother but reported observing domestic violence between mother and the maternal grandmother.

Mother had a previous dependency history involving an inconclusive allegation of general neglect in 2022. The social worker took minor into protective custody pursuant

---

[3] Father is not a party to the appeal.

3

to a detention warrant. On June 25, 2023, the department placed minor in the home of a maternal cousin.

On June 27, 2023, the department filed a section 300 juvenile dependency petition alleging, as pertinent here, that mother physically abused minor (a-1, b-2, & e-7), that mother had an untreated mental health problem (b-4), that mother had engaged in domestic violence in the presence of minor (b-6), and that mother had left minor without support (g-8). On June 28, 2023, the court detained minor.

In the July 17, 2023, jurisdiction and disposition report, the social worker recommended the court find the allegations in the petition true,[4] remove minor from mother's custody, and provide her reunification services. A medical report after a physical examination of minor indicated minor had "'linear, collinear, and patterned scars that are consistent with being struck with a flexible implement. This is consistent with inflicted trauma, physical abuse.'"

Mother admitted using a speaker cord resulting in minor being seriously, physically harmed. She agreed with the allegation of severe physical abuse to a child under five years of age but denied that she intended to cause physical harm. Mother denied domestic violence in the home with the maternal grandmother or the maternal aunt but reported one incident of domestic violence between she and father.

Mother was homeless but actively looking for housing. Her reunification plan included individual counseling, parenting classes, domestic violence classes, and anger

_____

[4] The social worker recommended the court find the g-8 allegation untrue. Mother had been released from custody on June 27, 2023.

4

management classes. The social worker recommended mother receive a psychological examination.

A social worker monitored an initial visit between mother and minor. Minor got excited to see mother. "[H]e ran up to [her] with a smile on his face, lifting his arms for her to pick him up. She picked him up and embraced him with a smile on her face. [Mother] brought hair supplies, coloring books, markers, blocks, toy cars and animal flash cards for the visit. [Minor] appeared to be attached to [mother] as she was able to rock him to sleep. The engagement between [mother] and [minor] was positive. She did floor play with him with the blocks, braided his hair and went over the animal flash cards with him. She praised him for being able to identify the animals on each card as well as the sound that they made. When it was time to leave [minor] became emotional and stated 'No' and began to cry."

In an additional information to the court filed on August 16, 2023, the social worker "reviewed the Children Assessment Center (CAC) report. The CAC report does not indicate multiple acts of abuse." Thus, the social worker recommended the e-7 allegation be dismissed.

The social worker observed four additional visits between mother and minor. Mother would bring minor's "favorite snacks and age appropriate toys such as blocks, piano, truck and cars. [Mother] also brought educational material such as flash cards and alphabet white board. [The social worker] observed that [minor] was extremely bonded to his mother as e[]videnced by him smiling and running up to her when he saw her.

[Mother] was receptive as e[]videnced by her picking him up and [hugging] him. [Mother] positive[ly] interact[ed] with [minor]. [Mother] engaged in age appropriate floor play activities such as playing with blocks, going over . . . animal flash cards, and participating in pretend restaurant play and sung nursery rhymes." Minor "was always excited to see the mother and cried when it was time to leave the visit" on two occasions. In a September 14, 2023, additional information to the court, the social worker observed minor cry when mother left after another visit.

At the hearing on September 14, 2023, the court found the allegations in the petition true,[5] adjudged minor a ward of the court, removed him from mother's custody, and ordered mother to participate in reunification services.

On November 10, 2023, the social worker received a referral when mother gave birth to minor 2 and disclosed that minor was in the department's custody. The social worker "contacted hospital staff, who reported the baby was born healthy, mother was bonding to the baby, and [they] had no further concerns to report." "The baby was observed to look healthy and was free of any visible marks and/or bruises."

The social worker took minor 2 into protective custody pursuant to a detention warrant. The department placed minor 2 with the maternal grandmother's cousin.

On November 14, 2023, the department filed a juvenile dependency petition alleging, as to minor 2 and as pertinent here, that parents had an open dependency case

---

[5] The court dismissed the g-8 allegation. Despite the social worker's recommendation that the e-7 allegation be dismissed, no one requested the court do so at the hearing, and the court found that allegation true.

for minor alleging physical abuse and domestic violence which placed minor 2 at similar risk (B-1, B-2, J-3, & J-4). On November 15, 2023, the court detained minor 2.

In the jurisdiction and disposition report as to minor 2, the social worker recommended the court find the allegations true, remove minor 2, and grant parents reunification services. The social worker supervised a visit between mother and minors. "The mother was affectionate throughout the visit with the children giving hugs, kisses and massaged [minor's] feet." "The mother brought new winter clothes and a Leap Frog 100 words book for the children. It should be noted the mother educated [minor] on the animals, alphabet and animal names. The mother also cited the letters of the alphabet with [minor]." "The mother was very soft spoken and affectionate in her communication with both children throughout the visit."

In the January 4, 2024, additional information to the court, the social worker reported that mother "completed the following service programs: twelve (12) sessions of Anger Management, twelve (12) sessions of Parenting Classes and twelve (12) sessions of Domestic Violence at Outreach Nation Clinic." Mother had completed her psychiatric evaluation, the results of which would be ready within two to three weeks.

Mother had weekly visitation with minors, during which the social worker "observed the mother to attend as scheduled . . . and is engaged with the children throughout the visit. The mother . . . is very attentive to the needs of the children."

In an additional information for the court filed February 6, 2024, the social worker reported that mother showed up on time for all scheduled visits with minor without

7

incident. In the attached report, the psychologist considered mother's assessment invalid due to mother's "reports of being confused and her having difficulty interpreting the . . . questions and answers provided." The psychologist recommended mother be reevaluated.

At the February 7, 2024, jurisdiction and disposition hearing as to minor 2, the court found the allegations in the petition true, adjudged minor 2 a ward of the court, removed him from mother's custody, and ordered mother to participate in reunification services. The court ordered mother to undergo another psychological assessment.

In the March 4, 2024, status review report as to minor, the social worker recommended "services continue to be provided mother . . . with the goal of Family Maintenance with authority for an extended visit after the mother has completed a psychiatric evaluation." The maternal cousin "reported she is committed to being a lifelong support to [minor]." "[Minor's] placement is appropriate. He is doing well, and all of his needs are being met. [Minor] has adjusted to the home." Minors visited weekly with each other; minor appeared to be bonded with minor 2. Minor had weekly visitation with the maternal grandmother, who transports "mother to and from visits."

"The mother . . . has stable housing with the maternal grandmother . . . and her three younger sister[s]. [Mother] reports having her own room and the children will be in the room with her. The home has three bedrooms and it appears that there would be enough room for the child to return to the home for an extended visit." "The mother has unsupervised visitation one time per week for two hours. The Department has authorized

8

increased unsupervised visitation to eight hours per week. The mother stated the visits maybe in the cousin home because of the ages of the child and where she lives compared to where she is placed."

In an additional information to the court filed March 28, 2024, the social worker reported that mother was on time and consistent with visitation with minors. Mother was patient with minors and remained focused on minors throughout the visits. "[M]inors see each other daily and the mother is checking in and staying connected with her supporters." Mother had two unsupervised visits during the reporting period.

At the hearing on March 29, 2024, minor's counsel stated, "Mother's visits have been going well, Your Honor. She just needs to complete the second psychological evaluation which is scheduled for April 2nd." The court continued mother's reunification services. The court further ordered, "Visitation between [minor] and his mother is ordered unsupervised for a minimum of one time per week for eight hours."

In a July 30, 2024, status review report, the social worker recommended mother's reunification services be continued "with the goal of Family Maintenance (FM) with authority for an extended visit with the mother." Mother had completed the wanger management, domestic violence classes, and parenting components of her case plan. Mother was scheduled for her second psychological evaluation, the results of which the department indicated it would submit to the court upon receipt of the report.

Mother had unsupervised visits with minor once weekly for eight hours. Mother had missed some visits due to transportation issues. The department provided mother

9

with gas cards and bus passes, and the resource parents had agreed to meet mother in between to help with the transportation distance. Although placed separately, minors saw each other daily for six hours, Monday through Friday, as they both attended the same daycare.

Mother reported that minors' "well-being is most important to her and that she wants her children to know that she loves them and is committing to being a better mother for them." "The mother reports that her biggest priority is her children and stabilizing herself so that she can provide the boys with a new life." "The mother reports that she is determined to make her own way for herself and her children."

At the August 7, 2024, hearing, the court continued mother's reunification services for minors. The court observed of mother, "I must commend you on the work that you've been doing. It's a very positive report about completing services, also you understand now how the relationship with the children's father was unhealthy and unsafe for the children. [¶] You have been separated from the father and acknowledged engaging in domestic violence and improper discipline of the children. But you're also acknowledging the importance of ensuring that you are fit and able to provide care for . . . your children, so it seems to me you're benefitting greatly from your services."

In the status review reports filed December 12, 2024, the social worker recommended the court return custody of minor to mother under family maintenance services pending the completion of a 29-day extended visit. Mother had requested individual therapy, to which the department referred her on August 27, 2024; mother

10

completed her eight sessions of therapy on October 3, 2024. "[M]other completed her second psychological evaluation . . . . The mother has been consistently engaged in her services and has remained in compliance with the Department."[6] Mother had successfully transitioned to having unsupervised, overnight, weekend visits with minors at the maternal grandmother's home.

At the hearing on December 19, 2024, there were no objections to the recommended 29-day unsupervised, extended visit. The court ordered minors placed with mother on an extended visit.

In an additional information to the court filed January 17, 2025, the social worker reported that she had completed three contacts with minors during their 29-day extended stay with mother. Mother had entered a women's shelter, in which she was allowed to have minors with her. "The children have both been observed to be doing well as they each have their own bed and playpen and also play with the other children in the shelter." "The mother has scheduled routine medical and dental appointments for the kids and continues to be in contact with the department."

"The children are bonded to their mother and have been observed to be dressed appropriately and free of marks and bruises during monthly contacts. The mother has made substantial progress and has demonstrated her ability to appropriately redirect [minor] if he is not following directions. The mother has been observed to demonstrate what she has learned in services and is utilizing the resources offered to her. [The

_____

[6] The results of the second psychological evaluation were unremarkable for purposes of the issue raised on appeal.

11

department] respectfully believes that the recommendation to return the children home to the mother under a Family Maintenance service component remains appropriate."

At the hearing on January 21, 2025, there were no objections to the recommendation that minors be returned to mother's custody under family maintenance services. The court ordered minors returned to mother's custody as dependents of the court.

On March 11, 2025, the social worker received a call from the maternal grandmother reporting concerns that mother was planning to relocate to Las Vegas, Nevada. Mother had been evicted from her transitional housing for violating program rules when she was discovered to have an unidentified male and three additional children in the home.

The maternal grandmother offered to allow mother and minors to move in with her. Mother responded that she was going to move in with the man, who was identified as her boyfriend, and his children in Las Vegas. The maternal grandmother informed mother that she could not move the children out of state while she still had an ongoing dependency case as to minors. Mother responded that she had a right to take minors out of state, and that the department would not be able to remove them.

The social worker repeatedly attempted to contact mother by phone and text, but mother never responded. The maternal grandmother found minors in the care of the boyfriend's children with no adult present.

An officer sent to conduct a welfare check reported that mother informed him her dependency case had been dismissed. The boyfriend had a prior criminal charge of child neglect and had three prior substantiated dependency allegations of emotional abuse, physical abuse, and general neglect regarding domestic violence with his children's mother.

On March 11, 2025, the department filed supplemental petitions alleging mother left minors without appropriate adult supervision (S-1). On March 12, 2025, the court detained minors on the supplemental petitions.

In the jurisdiction and disposition report on the supplemental petitions, the social worker recommended the court place minors in out-of-home care, deny mother reunification services, and set the section 366.26 hearing. The social worker interviewed mother, who acknowledged that the manager of the transitional housing informed her that she was not allowed to have guests. Despite the rule, mother had let her boyfriend and his children stay at the home on three occasions. Mother said she was aware the boyfriend had a prior dependency case, but she was unaware of the substance of the allegations. She said she did not know that he had any criminal charges.

Mother "reported that she had been thinking about the children and reported that she was considering sending the children back to the current caregivers because she was having difficulties transporting the children without a car of her own. The mother reported that she has given it some thought and does not believe that she is able to care for them on her own in addition to losing her transitional housing. The mother asked if

13

the children would be fine to remain with the relative caregivers, until she is back on her feet."

The maternal cousin and her husband had expressed their willingness to be a concurrent home for minor. Minors had been placed separately in relative homes but had weekly visitation with one another. "Both relatives had the children previously and have maintained the children's needs. The children have done well in placement prior to reunification and are doing well since returning . . . to placement."

At the hearing on April 2, 2025, the court noted, "Mother would be waiving family reunification services. In looking at the time line of this case, though, I don't believe the Mother is eligible for services and is statutorily out of time." Counsel for the department confirmed the court's assessment. The court found the allegations in the supplemental petitions true, removed minors from mother's custody, terminated reunification services, and set the section 366.26 hearing.

In the July 22, 2025, section 366.26 report, the social worker recommended the court terminate mother's parental rights. Minors "have had contact with mother on June 13, 2025. The caretakers reported that the visit went without any incidents." "The children's monthly visits with their mother were recently resumed on June 13, 2025. The mother had not kept her visits or cancelled due to lack of transportation or illness."

The social worker posited that minor "is an appropriate child for adoption." "His caregiver is able and willing to continue working with him. The caregiver loves [minor] and wants to help him grow and thrive." Minor's prospective adoptive parent, her

14

domestic partner, and her son live "in a peaceful and well-established area."  The prospective adoptive mother wanted minor "to have a relationship with his biological mother as long as it remains appropriate and beneficial to the child.  [Minor] will see his brother several times per week as his brother resides with [the prospective adoptive parent's] sister a few miles from her house."

On July 28, 2025, mother filed a section 388 petition requesting reinstatement of reunification services, alleging changed circumstances in that she had moved back in with the maternal grandmother, and that the requested order was in minor's best interest in having a stable home.  The court denied the petition as not stating a change of circumstances or being in minor's best interest.

In the July 29, 2025, additional information to the court, the social worker noted that "mother has not also been able to have consistent visits as the mother was on house arrest until July 12th."[7]  "The department plans to renew the mother's visits now that her house arrest is completed."

In the additional information to the court filed on September 02, 2025, the social worker reported, "The department plans to renew the mother's visits now that her house arrest is completed."  In yet another report on September 5, 2025, the social worker noted, "the department has completed the renewal for mother's visits."[8]

---

[7]  Presumably, the house arrest related to the disposition of the initial criminal charge against mother in this case; however, the record does not contain any more specific information about it.

[8]  It is unclear why there was a delay by the department in arranging visitation between mother and minor between July 12, and September 5, 2025.

At the section 366.26 hearing on September 9, 2025, mother testified that her current visitation order was for two hours weekly. She had missed some visitation due to having strep. Prior to their removal, minors lived with mother. They lived together "like a regular family, eating meals, bathing, discipline, and reading . . . ."

Mother prepares for visits by bringing "wipes, diapers, food, juice, toys, anything the kids might need." Minors are happy to see her at visits. "They usually run up to me, hug me, kiss me, and they usually make me carry them." At visits, "We read, we lay on the floor, play with cars. We take bathroom breaks to wash our hands. I take snacks. You know, anything the kids might want to do. Sometimes we color and just have fun." She holds and cuddles minors.

There are tears at the end of visits. Minors cling to her and express that they do not want the visits to end. Mother believes that if her parental rights were terminated, "it will create an emotional distress for the boys. They want to come home and see me all the time . . . ." "I think because they have an emotional connection with me and not seeing me will hurt them more than it already does." Mother and minor talked on FaceTime every night, and "he tells me—all the time that he wants to come home. He misses me. He loves me and he just wants his mommy."

"I sit on the phone with him. He talks to me. He talks about what he learned, what he's eating, what he's doing. I read to him through the phone. We sit. We laugh. We giggle."

The court found minor adoptable. The court cited *In re Caden C.* (2021) 11 Cal.5th 614 (*Caden C.*), noting that in order to establish the beneficial relationship exception to termination of parental rights, "mother must provide evidence of the first element, regular visitation and contact; the second element is a relationship the continuation of which would benefit the children; the third element that termination would be detrimental to the children." The court found that mother had met her burden of proof with respect to regular visitation.

As to the second prong, the court found that "the children lived with her prior to removal. They're happy to see her. They run up to her, hug her, call her 'Mom', say that they miss her, and that [minor] wants to come home. [¶] There appears to be an emotional attachment that the mother holds the children, cuddles them, changes the youngest child's diapers. She also is able to discipline [minor] and redirect him during visits. She testified there are tears at the end of the visits and that the children don't want the visit to end and that the children cling to her. Based on the mother's testimony, the Court will find that the mother has met her burden of proof as to the second element of In re Caden C."

With respect to the third element, "whether termination of parental rights would be detrimental to the children[,]" the court found that, "While the Mother has testified she believes terminating parental rights will cause distress for the children, that she believes the children would benefit from continuing the relationship and would suffer emotional

17

harm if her parental rights were terminated, this is all from the viewpoint of the mother, not the viewpoint of the children."

Minor "is only five years old as of today.  There's been no evidence presented that there is emotional dysregulation, that the children are suffering from night terrors after a visit with the mother.  There's no indication the caregiver has had issues with the children regressing in their behavior such as to indicate termination of parental rights would be detrimental to the children."  Thus, the court found that mother had not met her burden of proof that termination of her parental rights would be detrimental to minors.  The court terminated mother's parental rights.

## II.  DISCUSSION

Mother contends the juvenile court erred in declining to apply the beneficial parental relationship exception to termination of parental rights.  We agree.

"[T]he goal at the section 366.26 hearing is 'specifically . . . to select and implement a permanent plan for the child.'  [Citations.]  To guide the court in selecting the most suitable permanent arrangement, the statute lists plans in order of preference and provides a detailed procedure for choosing among them.  [Citation.]  According to that procedure, the court must first determine by clear and convincing evidence whether the child is likely to be adopted.  [Citation.]  If so, and if the court finds that there has been a previous determination that reunification services be terminated, then the court shall terminate parental rights to allow for adoption.  [Citation.]  But if the parent shows that termination would be detrimental to the child for at least one specifically enumerated

18

reason, the court should decline to terminate parental rights and select another permanent plan. [Citation.] As we have previously explained, '[t]he statutory exceptions merely permit the court, in exceptional circumstances [citation], to choose an option other than the norm, which remains adoption.'" (*Caden C.*, *supra*, 11 Cal.5th at pp. 630-631.)

"The exception at issue in this case is limited in scope. It applies where '[t]he court finds a compelling reason for determining that termination would be detrimental to the child due to one or more of the following circumstances: [¶] (i) The parents have maintained regular visitation and contact with the child and the child would benefit from continuing the relationship.' [Citation.] From the statute, we readily discern three elements the parent must prove to establish the exception: (1) regular *visitation and contact*, and (2) a *relationship*, the continuation of which would *benefit* the child such that (3) the termination of parental rights would be *detrimental* to the child." (*Caden C.*, *supra*, 11 Cal.5th at p. 631.) It is the parent who must prove all three elements by a preponderance of the evidence; the parent must "show a '*compelling* reason for determining that termination would be detrimental to the child . . . .'" (*Id.* at p. 635.)

Here, as the parties agree, the juvenile court found that mother maintained regular visitation with minor and had a beneficial bond with him. Thus, we address only the third prong, detriment.

"[I]n assessing whether termination would be *detrimental*, the trial court must decide whether the harm from severing the child's relationship with the parent outweighs the benefit to the child of placement in a new adoptive home. [Citation.] By making this

decision, the trial court determines whether terminating parental rights serves the child's best interests." (*Caden C.*, *supra*, 11 Cal.5th at p. 632.) "Because terminating parental rights eliminates any legal basis for the parent or child to maintain the relationship, courts must assume that terminating parental rights terminates the relationship. [Citations.] What courts need to determine, therefore, is how the child would be affected by losing the parental relationship—in effect, what life would be like for the child in an adoptive home without the parent in the child's life." (*Id.* at p. 633.) "[T]he question is just whether losing the relationship with the parent would harm the child to an extent not outweighed, on balance, by the security of a new, adoptive home." (*Id.* at p. 634.)

"[W]hether termination of parental rights would be detrimental to the child due to the child's relationship with his parent—is discretionary and properly reviewed for abuse of discretion." (*Caden C.*, *supra*, 11 Cal.5th at p. 640.) "A court abuses its discretion only when ""'the trial court has exceeded the limits of legal discretion by making an arbitrary, capricious, or patently absurd determination.'"" [Citation.] But ""'[w]hen two or more inferences can reasonably be deduced from the facts, the reviewing court has no authority to substitute its decision for that of the trial court.'"""" (*Id.* at p. 641.)

We agree with mother that the juvenile court abused its discretion in finding that termination of the relationship between mother and minor would not be detrimental to minor.

First, the court had already determined that mother visited consistently with minor and that their relationship was beneficial to minor.

20

Second, minor was less than three months shy of three years old when the department first took him into protective custody. During the proceedings, the court granted mother a 29-day unsupervised, extended visit with minor; later, the court returned minor to mother's custody for nearly two months under family maintenance services. Minor was five years old on the day that the juvenile court terminated mother's parental rights. Mother testified that they had lived together "like a regular family, eating meals, bathing, discipline, and reading . . . ." Thus, minor had spent approximately three of his five years of life in mother's custody. (*In re E.T.* (2018) 31 Cal.App.5th 68, 70 (*E.T.*) [the minors had spent almost half their lives with the mother].) This is unlike many cases in which the minor has spent little to no time in the parent's custody.

Third, mother progressed from once weekly supervised visits, to unsupervised visits twice weekly; to eight hours of unsupervised visits weekly; to unsupervised, overnight, weekend visits; to a 29-day extended visit; to a return to her custody for nearly two months with family maintenance services. Thus, mother had made substantial progress. (*E.T.*, *supra*, 31 Cal.App.5th at p. 77 [the minors had been returned to the mother with family maintenance services].) This is unlike many cases in which the parent has never even progressed to unsupervised visitation, let alone extended visits and a return to custody under family maintenance services.

Fourth, mother completed her reunification services. Mother had completed the anger management, domestic violence classes, and parenting components of her case plan. Mother completed two psychiatric evaluations. (*E.T.*, *supra*, 31 Cal.App.5th at

p. 77 [the mother's participation in reunification services].) In addition, mother herself requested and completed individual therapy.

Fifth, mother benefitted from the services. The court observed, "I must commend you on the work that you've been doing. It's a very positive report about completing services . . . ." The court noted, "it seems to me you're benefitting greatly from your services." The social worker noted, "The mother has been observed to demonstrate what she has learned in services and is utilizing the resources offered to her." (*Caden C.*, *supra*, 11 Cal.5th at pp. 637-638 ["[A] parent who gains greater understanding of herself and her children's needs through treatment may be in a better position to ensure that her interactions with the children have a '"positive" . . . effect' on them. [Citation.]"], citing *E.T.*, *supra*, 31 Cal.App.5th at p. 77.)

Sixth, the descriptions of mother's interactions with minor during visitation were consistently positive, even bordering on exemplary. Mother constantly brought toys and educational materials for minor, which she used to engage with him. For example, "[Mother] brought hair supplies, coloring books, markers, blocks, toy cars and animal flash cards for the visit." "The engagement between [mother] and [minor] was positive. She did floor play with him with the blocks, braided his hair and went over the animal flash cards with him. She praised him for being able to identify the animals on each card as well as the sound that they made."

Seventh, minor and mother were consistently described as emotionally bonded. Minor "ran up to [mother] with a smile on his face, lifting his arms for her to pick him

up.  She picked him up and embraced him with a smile on her face."  "[Minor] appeared to be attached to [mother] as she was able to rock him to sleep."  The social worker "observed that [minor] was extremely bonded to his mother as e[]videnced by him smiling and running up to her when he saw her.  [Mother] was receptive as e[]videnced by her picking him up and [hugging] him."  "The mother was affectionate throughout the visit with the children giving hugs, kisses . . . ."  "The mother was very soft spoken and affectionate in her communication with both children throughout the visit."  "The children are bonded to their mother . . . ."  Minor would cry when it was time to end visits.

Eighth and finally, mother's own, uncontradicted descriptions and testimony regarding her relationship with minor established the depth of their bond.  Mother reported that minors' "well-being is most important to her and that she wants her children to know that she loves them and is committing to being a better mother for them."  "The mother reports that her biggest priority is her children and stabilizing herself so that she can provide the boys with a new life."  "The mother reports that she is determined to make her own way for herself and her children."

Mother testified that minors were happy to see her at visits.  "They usually run up to me, hug me, kiss me, and they usually make me carry them."  She holds and cuddles minors.  At the end of visits, minor would cling to her, cry, and tell her he did not want the visits to end.  Mother believed that if her parental rights were terminated, "it will create an emotional distress for the boys.  They want to come home and see me all the

time . . . ."  "I think because they have an emotional connection with me and not seeing me will hurt them more than it already does."  (*E.T.*, *supra*, 31 Cal.App.5th at p. 77 [The mother testified that severance of their relationship would be horrible for the children and would not benefit them].)

Mother testified that even after the juvenile court terminated her reunification services, she and minor talked on FaceTime every night, and "he tells me—all the time that he wants to come home.  He misses me.  He loves me and he just wants his mommy."

We note that neither minor's counsel nor counsel for the department cross-examined mother or put on other witnesses to dispute mother's testimony; thus, her testimony was uncontradicted.  In fact, the juvenile court expressly credited mother's testimony.  Moreover, although evidence of "emotional dysregulation," "night terrors," and "regressing . . . behavior," as cited by the court, would certainly support mother's assertion of detriment, contrary to the court's apparent concern, no such evidence is required.

Thus, despite mother's failures, the record demonstrates a deep-seated bond between she and minor, the severance of which would be detrimental to minor.  (*In re E.T.*, *supra*, 31 Cal.App.5th at p. 70 ["This is the rare case where the juvenile court erred in failing to recognize that Mother's relationship with her children outweighed the benefit to the children that would accrue from termination of parental rights and a plan of adoption"].)

## III. DISPOSITION

The order terminating mother's parental rights and freeing minor for adoption is reversed, and the matter is remanded to the juvenile court for further proceedings consistent with this opinion.

NOT TO BE PUBLISHED IN OFFICIAL REPORTS

McKINSTER _____<br>J.

We concur:

RAMIREZ _____
      P. J.

FIELDS _____
      J.