Filed 11/17/21  In re T.T. CA1/4

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION FOUR

| | |
|---|---|
| In re T.T., a Person Coming Under the Juvenile Court Law. | |
| SAN FRANCISCO HUMAN SERVICES AGENCY,<br><br>      Plaintiff and Respondent,<br><br>v.<br><br>G.R.,<br><br>      Defendant and Appellant. | A162584<br><br>(City & County of San Francisco Super. Ct. No. JD19-3156) |

G.R. (mother) appeals an order terminating her parental rights to her now three-year-old daughter, T.T., and selecting adoption as the child's permanent plan under Welfare and Institutions Code section 366.26.[1] She contends, among other things, the court erred in finding that the "parental-benefit" exception to the termination of parental rights does not apply. (§ 366.26, subd. (c)(1)(B)(i).) After the trial court's order was entered, the California Supreme Court decided *In re Caden C.* (2021) 11 Cal.5th 614 (*Caden C.*), in which the court provided new guidance regarding how the parental-benefit exception should be applied. Although we recognize it is in T.T.'s interest to expeditiously select her permanent plan, we cannot

---

[1] All statutory references are to the Welfare and Institutions Code.

determine on the record before us that the juvenile court's ruling complied with the principles announced in the Supreme Court's decision. Accordingly, we will reverse the order terminating parental rights and remand this matter for a new section 366.26 hearing in light of the legal standards articulated in *Caden C.*[2]

## Background

In June 2019, the agency filed a petition alleging that then two-year-old T.T. came within the meaning of section 300 based on her exposure to her parents' domestic violence and her mother's substance abuse. At the jurisdictional and dispositional hearing, the court declared dependency and ordered family maintenance services for mother, including participation in domestic violence and substance abuse services.[3]

In November 2019, the agency filed a supplemental petition seeking to remove T.T. from mother, after mother took methamphetamine and then checked herself into a hospital for mental health treatment. The court sustained the allegations of the supplemental petition and placed T.T. with her maternal aunt. The court ordered supervised visitation and reunification services for mother.

At the sixth-month review hearing in September 2020, the court

---

[2] In light of this conclusion, we do not reach mother's additional argument that the trial court abused its discretion in failing to grant her request for a continuance of the section 366.26 hearing so that she could clarify the aunt's preference as to T.T.'s permanent plan. The aunt's preference and the applicability of the relative guardian exception to the termination of parental rights (§ 366.26, subd. (c)(1)(A)) should be considered on remand at the new permanency planning hearing.

[3] A restraining order was issued shortly after the petition was filed prohibiting T.T's father from having any contact with T.T. or mother. Father is not a party to the present appeal.

found that reasonable services had been provided but that mother had made minimal progress in completing her case plan. The court found that there was no substantial probability of T.T.'s timely return to mother, terminated mother's services, and scheduled a section 366.26 hearing for January 2021. The hearing originally set for January was continued for a contested hearing in April 2021.

The agency's reports submitted in advance of the hearing showed that mother's virtual visitation between July and November of 2020 was inconsistent but, since then, mother had participated in monthly virtual visits. Mother also had attended several family events including a birthday party, family picture day and Thanksgiving in the later part of 2020, and had accompanied T.T. to a doctor's appointment in January 2021. The social worker also indicated that mother reported that she has "been going to a methadone center in San Francisco and receiving her methadone daily for the past thirty days, that she gets drug tested and attends substance abuse counseling weekly." The agency recommended adoption as "the best permanency plan for this minor considering the age and the fact that the current caregiver and maternal aunt desires to adopt her niece." The report added that the aunt "agrees to allow mother to visit with [T.T.] as long as she is in a program, clean and sober."

At the hearing, the social worker confirmed that mother had commenced monthly in-person visits a few months prior to the hearing. She also explained that the temporary inconsistency in mother's virtual visits in 2020 was caused by mother not having a working phone. She also testified that T.T. recognizes mother as "mom" and that they have a "good relationship." She continued to recommend adoption over legal guardianship,

despite the aunt's willingness to consider both, because adoption would provide T.T. with more stability.

Mother testified that she cared for T.T. by herself until T.T. was two and that she had been visiting with T.T. in person once a month and by video weekly. She also testified that she had been clean and sober for "six months and four days today" and had participated in substance abuse treatment, therapy and parenting classes.

The trial court acknowledged that this case was a "close call" but ultimately concluded that the permanency of adoption was in the child's best interest. The court explained that mother "still has some work to do" and "[u]nfortunately the law goes against her. There's a very short window of time for [mother] to do what she needs to do to be clean and sober, to do her counseling, given that the child was under three and has in fact recently turned three years old. [¶] So I can't agree that she did what she needed to do. I can agree . . . that [she] is a decent mom and a decent person and has worked hard on herself and is working very hard on herself. She was using heroin five months ago. She was using crystal methamphetamine, one of the most serious drugs imaginable. She's been clean now of crystal meth, as I understand it for six months. She has done and is doing counseling and is on methadone maintenance. She is trying to get off methadone maintenance, which is a very tricky time for someone in their recovery. And she wants her daughter, in her words, quote, 'to see the better me, the sober me.' And I have no doubt if she keeps working and doesn't stop her recovery and therapy and treatment, that [T.T.] will see the sober [mother] and the better [mother], and I believe she will see the loving caring parent. [¶] But at this point, although there certainly is a familial relationship. and I'll use the word bond, I cannot say it's outweighed by the permanency that [the aunt] is willing to provide for

4

[T.T.] in terms of adoption. I am very thankful that they have a great relationship and — and that they will continue to have a strong sister family relationship and bond between themselves and work out visitation and work out family visits and work out celebrations. I have no doubt that [the aunt] will celebrate with [mother] when there are things to celebrate, that she'll help her and assist her during the more challenging times, but there are some challenges ahead for this young mother, and she still has a ways to go in her recovery."

Mother timely filed a notice of appeal.

### Discussion

The purpose of the section 366.26 hearing is to select a permanent plan for the child after reunification efforts have failed. (§ 366.26, subd. (b); *In re Marilyn H.* (1993) 5 Cal.4th 295, 304.) Adoption, where possible, is the permanent plan preferred by the Legislature for a dependent minor child who has not been returned to the custody of his or her parents and is found by the court to be adoptable. (*In re Autumn H.* (1994) 27 Cal.App.4th 567, 573.) When the court finds that a child is likely to be adopted if parental rights are terminated, it must select adoption as the permanent plan unless "the parent shows that termination would be detrimental to the child for at least one specifically enumerated reason." (*Caden C., supra*, 11 Cal.5th at p. 630.)

Here, mother contends the court erred in finding that the "parental-benefit" exception does not apply. (§ 366.26, subd. (c)(1)(B)(i).) *In Caden C.* the court explained, for this exception to apply, a parent is required to show "(1) regular visitation and contact, and (2) a relationship, the continuation of which would benefit the child such that (3) the termination of parental rights would be detrimental to the child." (*Caden C., supra*, 11 Cal.5th at p. 631, italics omitted.) "The first element—regular visitation and contact—is

5

straightforward. The question is just whether 'parents visit consistently,' taking into account 'the extent permitted by court orders.' " (*Id.* at p. 632.) "As to the second element, courts assess whether 'the child would benefit from continuing the relationship.' [Citation.] Again here, the focus is the child. And the relationship may be shaped by a slew of factors, such as '[t]he age of the child, the portion of the child's life spent in the parent's custody, the "positive" or "negative" effect of interaction between parent and child, and the child's particular needs.' " (*Ibid.*, quoting *In re Autumn H., supra*, 27 Cal.App.4th at p. 576.) "Concerning the third element—whether 'termination would be detrimental to the child due to' the relationship—the court must decide whether it would be harmful to the child to sever the relationship and choose adoption." (*Id.* at p. 633.)

The court's decision in *Caden C.* focuses primarily on the third element. The court rejected reliance on whether the parents have complied with their case plan and explained, "Because terminating parental rights eliminates any legal basis for the parent or child to maintain the relationship, courts must assume that terminating parental rights terminates the relationship. [Citations.] What courts need to determine, therefore, is how the child would be affected by losing the parental relationship—in effect, what life would be like for the child in an adoptive home without the parent in the child's life. [Citation.] . . . [T]he effects might include emotional instability and preoccupation leading to acting out, difficulties in school, insomnia, anxiety, or depression [or] . . . a new, stable home may alleviate the emotional instability and preoccupation leading to such problems, providing a new source of stability that could make the loss of a parent not, at least on balance, detrimental. [¶] In each case, then, the court acts in the child's best interest in a specific way: it decides whether the harm of severing the

6

relationship outweighs 'the security and the sense of belonging a new family would confer.' [Citation.] 'If severing the natural parent/child relationship would deprive the child of a substantial, positive emotional attachment such that,' even considering the benefits of a new adoptive home, termination would 'harm[]' the child, the court should not terminate parental rights." (*Caden C., supra*, 11 Cal.5th at p. 633, quoting *In re Autumn H., supra*, 27 Cal.App.4th at p. 575.)

Here, although the agency suggests that mother has not maintained regular visitation sufficient to satisfy the first requirement for application of the exception, the trial court implicitly found that mother had established consistent visitation and substantial evidence supports that implicit finding. (See *Caden C., supra*, 11 Cal.5th at pp. 639-640 ["The determination that the parent has visited and maintained contact with the child 'consistently,' taking into account 'the extent permitted by the court's orders' [citation] is essentially a factual determination."].) At the section 366.26 hearing, the court questioned the social worker on her statement that mother's visitation had been inconsistent and the social worker explained that mother's inconsistency was during the Covid pandemic when issues with her phone interfered with her virtual visits. The record reflects that apart from those technological issues, mother has consistently visited with her daughter.

Substantial evidence also supports the trial court's finding that mother had a familial bond with her daughter. (See *Caden C., supra*, 11 Cal.5th at pp. 639-640 ["It's likewise essentially a factual determination whether the relationship is such that the child would benefit from continuing it."].) The evidence was undisputed that T.T. calls mother "mom" and relates to her as her mother. Mother was T.T.'s primary caregiver for the first two years of her

7

life and the social worker acknowledged that her "good" relationship with T.T. had not changed since her placement with her aunt.

With respect to the third requirement, the court's determination that termination of parental rights would not be detrimental to T.T. is subject to a "hybrid" standard of review. (*Caden C., supra*, 11 Cal.5th at p. 641.) The court's factual determinations regarding, among other things, the specific features of the child's relationship with the parent, the harm that would come from losing those specific features, and how the prospective adoptive placement may offset and even counterbalance those harms are reviewed for substantial evidence. (*Id.* at p. 640.) The court's "delicate balancing" of "the harm of losing the relationship against the benefits of placement in a new, adoptive home" is discretionary and properly reviewed for abuse of discretion. (*Ibid.*)

Here, although the trial judge thoughtfully weighed T.T.'s best interests, we cannot be certain that improper factors were not considered and that the court sufficiently considered the harm T.T. may suffer from termination of the parental relationship with mother. In explaining its ruling, the trial court made reference to the fact that mother still had "work to do" on her case plan and that mother would continue to face significant hurdles in maintaining her sobriety. In *Caden C.*, the court explained that a "parent's struggles with issues such as those that led to dependency are relevant only to the extent they inform the specific questions before the court: would the child benefit from continuing the relationship and be harmed, on balance, by losing it?" (*Caden C., supra*, 11 Cal.5th at p. 638.) The court held that "[p]arents need not show that they are 'actively involved in maintaining their sobriety or complying substantially with their case plan' [citation] to establish the exception." (*Id.* at p. 637 & fn. 6, disapproving *In re Noah G.*

(2016) 247 Cal.App.4th 1292, 1304 [parents must show that they are actively involved in maintaining their sobriety or complying substantially with their case plan to establish the parental-benefit exception].) As the agency argues, the court did not expressly find "the exception inapplicable as a result of mother's ongoing struggles with substance abuse" or indicate that her failure to fully resolve her substance abuse issues "served as a bar to applicability of the exception." Nonetheless, the court's comments reflect some ambiguity regarding the court's consideration of mother's failure to complete her case plan and ongoing struggles with sobriety.

There is also ambiguity as to whether the court improperly relied on the aunt's willingness to include mother in T.T.'s life. (See *Caden C., supra*, 11 Cal.5th at p. 633 ["courts must assume that terminating parental rights terminates the relationship"]; *In re E.T.* (2018) 31 Cal.App.5th 68, 72 [application of exception should not be impacted by fact mother had a long-term relationship with godparent caretakers]; *In re C.B.* (2010) 190 Cal.App.4th 102, 127-128 [finding that the trial court erred in considering the adoptive parent's willingness to allow the children to continue to have contact with the mother as a factor at the selection and implementation hearing]; *In re S.B.* (2008) 164 Cal.App.4th 289, 300 [a parent should not lose his or her parental rights "on the basis of an unenforceable promise of future visitation by the child's prospective adoptive parents"].) Again, the agency argues that the trial court's comments merely reflect the "reality" of the sibling relationship between mother and her sister but do not amount to an express finding that "termination of parental rights was justified *because* there would be post termination contact." A similar argument was recently rejected in *In re J.D.* (2021) 69 Cal.App.5th 594. There, the court explained, "The juvenile court's assumption . . . that postadoption contact was not necessarily

9

precluded is understandable as a practical matter. But as a legal matter, such considerations must be put aside in assessing whether a child would be harmed by the loss of a significant, positive emotional relationship with a natural parent to such a degree that it is the child's best interest to select some permanent plan short of adoption. Because the record reflects the court did not put such considerations aside when it ruled on several evidentiary objections, we cannot be certain it properly evaluated the evidence when it came time to render its ultimate decision to terminate mother's parental rights." (*Id.* at p. 628.) The same can be said of the court's comments in the present case.

Given that the trial court's explanation touched on only the above topics and in view of the importance of the parental relationship, we deem it prudent to remand for reconsideration so that the trial court can make its findings with the benefit of the guidance provided in *Caden C.*

## Disposition

The order terminating parental rights is reversed and the matter remanded for reconsideration.

POLLAK, P. J.

WE CONCUR:

STREETER, J.
ROSS, J.*

---

* Judge of the Superior Court of California, County of San Francisco, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.

10