Filed 4/16/25  In re N.L. CA4/3

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b). This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FOURTH APPELLATE DISTRICT

DIVISION THREE

| | |
|---|---|
| In re N.L., a Person Coming Under the Juvenile Court Law. | |
| ORANGE COUNTY SOCIAL SERVICES AGENCY,<br><br>        Plaintiff and Respondent,<br><br>              v.<br><br>J.D.,<br><br>        Defendant and Appellant. | G064642<br><br>(Super. Ct. No. 19DP0311)<br><br>O P I N I O N |

Appeal from an order of the Superior Court of Orange County, Daphne G. Sykes, Judge. Conditionally reversed and remanded with directions. Respondent's request for judicial notice denied.

Paul A. Swiller, under appointment by the Court of Appeal, for Defendant and Appellant.

Leon J. Page, County Counsel, Debbie Torez and Chloe R. Maksoudian, Deputy County Counsel, for Plaintiff and Respondent.

No appearance for the Minor.

*        *        *

In March 2019, the Orange County Social Services Agency (the Agency) took three-year-old N.L. (Daughter) and five-year-old J.L., Jr. (Son) into protective custody, alleging general neglect and related claims. The Orange County Juvenile Court (the court) found the children to be dependents and ordered reunification services for J.D. (Mother).

In August 2024, following a second permanency placement hearing, the court found Daughter to be adoptable and terminated parental rights. (Welf. & Inst. Code, § 366.26.)[1] The court found the beneficial relationship exception to adoption did not apply; however, the court did not make the required findings under the Indian Child Welfare Act (ICWA).

Under a hybrid standard of review, we find substantial evidence to support the court's substantive rulings, and we find no abuse of its discretion. As to the ICWA, County Counsel concedes the error, and we agree. Thus, the court's order terminating parental rights is conditionally reversed, and the matter is remanded for the limited purpose of ICWA compliance.

I.

FACTS AND PROCEDURAL BACKGROUND

On March 14, 2019, at about 10:30 a.m., Son left the home of Mother and went next door to a gas station by himself. Son was barefoot, shirtless, and looking for candy. The worker at the gas station told police that Son often came into the store looking for food. Police had received a similar call about three weeks prior. Police determined Mother would be arrested due

---

[1] Further undesignated statutory references are to the Welfare and Institutions Code. Mother filed this appeal, which only concerns the court's section 366.26 rulings as to Daughter. The presumed father never appeared in court and is not a party.

to the reoccurring nature of the issue.

Police went to Mother's home where Daughter was present and hungry. Mother told the officers that the father of both children might be in custody. Police noted that milk inside of the refrigerator appeared to have gone bad. Mother told police the two children had not had breakfast, stating that they "were not 'morning eaters.'" Both children complained of hunger and were provided with snacks.

Mother was taken into custody on charges of child abuse. (Pen. Code, § 273, subd. (a).) The children were detained at a facility. Daughter said Mother had left all night and went shopping. Daughter was unable to answer who was in the home. Mother reported that the children's father had left her homeless. Mother's other child by a different father, 13-year-old C.H., had not resided in the home since 2016, when he was found to have sexually abused Daughter. The Agency conducted a safety assessment and determined that Son and Daughter were not presently safe in the home due to several factors, including three or more prior neglect referrals, and three or more prior abuse referrals.

*Jurisdiction/Disposition Proceedings*

On March 18, 2019, the Agency filed a juvenile dependency petition alleging Daughter came within the jurisdiction of the court due to failure to protect, sexual abuse, no provision for support, and abuse of sibling. (§ 300, subds. (b)(1), (d), (g), (j).)

On May 15, 2019, the court conducted a jurisdiction/disposition hearing. Mother waived her rights to a trial and submitted as to the Agency's allegations. The court declared Daughter to be a dependent of the court and removed her from Mother's custody. The court ordered family reunification

services for Mother, including substance abuse treatment and testing, parenting courses, and individual counseling. The court ordered monitored visitations.

*Six-Month Review Hearing*

On November 13, 2019, the court conducted a six-month review hearing. The Agency filed a report before the hearing noting Son and Daughter were then currently placed together in the same foster home. Mother had completed a 12-hour parenting program and a 16-week substance abuse program. Mother had also been attending AA meetings, was participating in therapy, and a personal empowerment program. Mother was having 10 hours of supervised visitation per week.

The Agency recommended the children continue to be dependent children of the court, that reunification services continue, and that the court should schedule the matter for a 12-month review hearing. The court adopted the Agency's recommendations.

*12-Month Review Hearing*

On May 7, 2020, the court had scheduled a 12-month permanency review hearing. The Agency filed a status review report in advance of the hearing. The Agency recommended the court continue family reunification services. Mother contested the recommendation, and the parties stipulated to a later date for the contested hearing, which was then continued several times, in part, due to the ongoing Covid-19 epidemic.

During an interview in June 2020, Daughter reported seeing a fight between Mother and her current boyfriend. Daughter had a large, oval shaped dark purple bruise on her upper right leg. Daughter reported Mother

had hit her and Son with a shoe after getting mad. In July 27, 2020, the Agency changed its recommendation to termination of reunification services, and suitable placement.

*12 and 18-Month Review Hearing*

On October 15, 2020, the court conducted a combined 12 and 18-month review hearing. The court read and considered five reports filed by the Agency. The Agency recommended the court terminate reunification services and schedule a section 366.26 permanency planning hearing. The court followed the Agency's recommendations.

*First Section 366.26 Hearing*

On March 22, 2021, the court conducted the first section 366.26 hearing. The Agency recommended that the termination of parental rights at this time would be detrimental. The Agency noted Mother had maintained regular visits and contact with the children, and they would benefit from the continued relationship. The children were living separately with nonrelative caregivers who were willing and capable of providing a stable and permanent environment, but the caregivers were not willing to become legal guardians as of the date of the hearing. The court adopted the recommendations of the Agency and set the matter for further proceedings.

*Developments Before a Second Section 366.26 Hearing*

In September 2021, Daughter was placed with C. S. and R. S. (who would later become the de facto parents).

In February 2022, the Agency reported that Daughter (who was now six years old and in kindergarten) was doing well in her placement. Son

was in a separate placement. The de facto parents expressed an interest in adopting Daughter. Mother's visitations were inconsistent, and the de facto parents expressed a concern in Daughter's numerous negative behaviors when visits were cancelled.

From August 2022 to November 2022, the Agency reported that Mother had cancelled four of 13 visitations with little notice. On one occasion, Daughter described that Mother "knows when my birthday is, but she didn't know it passed already."

In February 2023, it was reported that Daughter had repeatedly expressed that she wanted to live with de facto parents, and to have only visits with Mother. Daughter's therapist recommended adoption: "For the past four years, she has been in limbo in terms of where her home is. She asks questions almost on a daily basis . . . regarding where she will end up living. She is clearly anxious about this and needs to know that she is in a forever home. In my experience, adoption has typically been sought for a child of this age. She appears to be very attached to her [de facto] parents and has been in the home for 16 months. She also seems to be well connected at her school with her teacher and school personnel."

*Second Section 366.26 Hearing*

On June 12, 2024, the court began a second section 366.26 hearing. Six witnesses testified over several weeks. At the conclusion of the hearing in August, the court found Daughter to be adoptable, found that the beneficial relationship exception did not apply, and terminated parental rights (the hearing and the court's ruling will be covered in greater detail in the discussion section of this opinion). The court made no oral or written ICWA findings.

## II.

## DISCUSSION

Mother claims A) the court erred by finding the beneficial relationship exception did not apply; and B) that conditional reversal is required because the court failed to make ICWA findings. We shall analyze each claim.

### A. Beneficial Relationship Exception

At the section 366.26 hearing, the juvenile court determines a permanent plan for the child, and may generally order adoption, guardianship, or long-term foster care. (*In re J.C.* (2014) 226 Cal.App.4th 503, 528.) "'[T]here is strong preference for adoption over the alternative permanency plans.'" (*In re Anthony B.* (2015) 239 Cal.App.4th 389, 394–395.)

Ordinarily, if the juvenile court finds the child adoptable it must then terminate parental rights. (*In re E.T.* (2018) 31 Cal.App.5th 68, 76.) "'In order to avoid termination of parental rights and adoption, a parent has the burden of proving, by a preponderance of the evidence, that one or more of the statutory exceptions to termination of parental rights . . . apply.'" (*Ibid.*)

In this part of the discussion, we will: 1) consider the legal principles regarding the beneficial relationship exception to the preference for adoption; 2) summarize the relevant court record, and 3) analyze whether the court's ruling is supported by substantial evidence and/or whether the court's ruling constitutes an abuse of discretion.

#### 1. Relevant Legal Principles

Under the beneficial relationship (or parental bond) exception, a parent is required to show three things: "(1) regular *visitation and contact,*

and (2) a *relationship*, the continuation of which would *benefit* the child such that (3) the termination of parental rights would be *detrimental* to the child." (*In re Caden C.* (2021) 11 Cal.5th 614, 631 (*Caden C.*).)

"The first element—regular visitation and contact—is straightforward. The question is just whether 'parents visit consistently,' taking into account 'the extent permitted by court orders.'" (*Caden C., supra,* 11 Cal.5th at p. 632.) "As to the second element, courts assess whether 'the child would benefit from continuing the relationship.' [Citation.] Again here, the focus is the child. And the relationship may be shaped by a slew of factors, such as '[t]he age of the child, the portion of the child's life spent in the parent's custody, the "positive" or "negative" effect of interaction between parent and child, and the child's particular needs.'" (*Ibid.)* "Concerning the third element—whether 'termination would be detrimental to the child due to' the relationship—the court must decide whether it would be harmful to the child to sever the relationship and choose adoption." (*Id.* at p. 633.)

As to the first two elements, the substantial evidence standard of review applies. (*Caden C., supra,* 11 Cal.5th at pp. 639–640.) "The determination that the parent has visited and maintained contact with the child 'consistently,' taking into account 'the extent permitted by the court's orders' [citation] is essentially a factual determination. It's likewise essentially a factual determination whether the relationship is such that the child would benefit from continuing it." (*Ibid.*)

"The third element—whether termination of parental rights would be detrimental to the child—is somewhat different. As in assessing visitation and the relationship between parent and child, the court must make a series of factual determinations. These may range from the specific features of the child's relationship with the parent and the harm that would

8

come from losing those specific features to a higher-level conclusion of how harmful in total that loss would be. The court must also determine, for the particular child, how a prospective adoptive placement may offset and even counterbalance those harms. In so doing, it may make explicit or implicit findings ranging from specific benefits related to the child's specific characteristics up to a higher-level conclusion about the benefit of adoption all told. All these factual determinations are properly reviewed for substantial evidence." (*Caden C.*, *supra*, 11 Cal.5th at p. 640.)

"[T]he court must also engage in a delicate balancing of these determinations as part of assessing the likely course of a future situation that's inherently uncertain. The decision . . . require[s] assessing what the child's life would be like in an adoptive home without the parent in his life. [Citation.] The court makes the assessment by weighing the harm of losing the relationship against the benefits of placement in a new, adoptive home. And so, the ultimate decision—whether termination of parental rights would be detrimental to the child due to the child's relationship with his parent—is discretionary and properly reviewed for abuse of discretion." (*Caden C.*, *supra*, 11 Cal.5th at p. 640.)

### 2. The Operative Section 366.26 Hearing

On June 12, 2024, the court began the section 366.26 hearing. Prior to its ruling on August 29, 2024, the court read, considered and admitted into evidence 19 reports filed by the Agency dating from December 8, 2022, to July 15, 2024. The court heard testimony from six witnesses.

Daughter's current social worker, Jose Castaneda, testified that he had been assigned to the case since April. Castaneda said that a couple of weeks before his assignment, he had met with Mother and the de facto

parents. In a report dated June 11, 2024, Castaneda stated that Daughter was adoptable and that parental rights be terminated, which was the Agency's recommendation. Castaneda had spoken to the de facto parents who wanted to adopt Daughter.

Daughter's prior social worker, Juan Gavia, testified that he had been assigned to the case in approximately April 2022. Gavia testified that he had made varied recommendations regarding the permanent plan for Daughter. Gavia had made numerous recommendations to terminate parental rights, but there were two occasions where he did not recommend terminating parental rights. Gavia's current (personal) recommendation at the time of his testimony was not to terminate parental rights. Gavia admitted that when numerous visitations by Mother were cancelled it was harmful to Daughter.

Mother testified that she has a caring, loving, beautiful relationship with Daughter. Mother said that her late arrivals for some of her visitations were not a reflection on the love she has for Daughter. Mother said that her opinion was that the de facto parents were rude. When asked about missed visitations (the questioner noted that about 25 percent of visitations were missed according to a February 27, 2024, Agency report), Mother testified that she still wanted more visits. Mother said she understood that Daughter became very sad and distraught when she would miss visitations.

Dr. Jessica Borelli testified that she was a psychologist specializing in attachment relationships, and she was hired by Mother's counsel. Based on the Agency reports and her own observations, Borelli opined Daughter had a very strong attachment to Mother. Borelli admitted that Mother's missed visitations had been challenging. Borelli testified that

she was not in a position to evaluate Daughter's relationship with the de facto parents. Borelli admitted that adoption may provide Daughter stability and psychological resources to move through life.

Dr. Alyssa Byerly testified that she was Daughter's therapist. Byerly testified that Daughter "has reported to me that she gets very stressed before and after visits with [Mother]. She has reported that she gets stressed when her mom does not come to visits, and she gets stressed when she is separated from her foster father." As far as visitations, Byerly said that Daughter "has expressed and reported confusion that she can attend the visits and her mom can't." Byerly testified that Daughter has reported that the source of her stress "is often the uncertainty, whether mom is going to confirm visits or not."

R.S. testified that he was one of two de facto parents and had been caring for Daughter for about three years at the time of the hearing. R.S. said that he and his wife had gone through all the necessary foster parent training and been approved to adopt Daughter after an assessment had been completed in their home. R.S. testified that it was his family's desire to adopt Daughter because: "She's become family. When she's in distress, we're the ones that comfort her. When she falls, we're the ones who put the band-aid on." As far as visitations, R.S. testified that he would frequently take Daughter to the location, but Mother would not show up. For example, R.S. testified that of the 34 visits that had been made available to Mother so far this year, Mother had shown up for only 20 of them. And of those 20 visits, Mother showed up on time to only two of them. R.S. testified Daughter "gets anxious and [it] starts with the car ride. She gets anxious and then nervous and as we wait there's a time check and then behaviors begin to escalate waiting to see if mom will make it."

11

After hearing oral arguments from counsel, the court began by stating that "this is not an easy case at all." After ruling as to Son, the court ruled as to Daughter that "this child is both generally and specifically adoptable." As a result, the court ruled that "the burden has shifted . . . to mother for her to demonstrate the sufficiency of the evidence in the three prongs of *Caden C.*"

The court ruled as to "the first prong, the Court finds that the visitation has been sporadic and inconsistent. This unpredictability is the hallmark of instability."

The court continued as to "the second prong, there's undisputably a loving relationship between mother and daughter." However, the court noted various "problem/issues" resulting from Mother's sporadic and inconsistent visitations which included: "moments of parentification; missed cues by mom; frustration; chronic letdowns; and behavior, which effectively communicates that the child is not the priority week after week." The court stated that as a result, Daughter was exhibiting various negative behaviors, including: "depression; anxiety; self-harm; [and] acting out, to name a few, directly related to these visits and relationship with mother."

"The court finds this relationship does not outweigh the benefits [and] permanence of adoption. I find it will be detrimental to continue it in the legal guardianship context. [¶] I also find insufficient evidence that the sibling-relationship exception applies." The court noted that "the wishes of the child, consistent with the child's age" had been considered and the Agency's reports had been admitted into evidence. The court found by clear and convincing evidence that Daughter was likely to be adopted. The court then terminated parental rights.

12

### 3. Application and Analysis

Here, under the first element of *Caden C.*, Mother maintained some visitations with Daughter; however, there was substantial evidence to support the court's explicit finding that the visitations were sporadic and inconsistent and therefore this element was not met. (See *Caden C.*, *supra*, 11 Cal.5th at p. 632 ["The question is . . . whether 'parents visit consistently,' taking into account 'the extent permitted by court orders'"].)

Under the second element of *Caden C.*, there was some evidence Mother's relationship with Daughter was to some extent positive. However, the testimony of some of the witnesses, and the voluminous evidence in the Agency's reports—particularly the evidence about the missed visitations by Mother, and the impacts that these missed visitations caused to Daughter— provides substantial evidence to support the court's ruling that Daughter's relationship with Mother overall was not beneficial. (See *Caden C.*, *supra*, 11 Cal.5th at p. 632; see also *In re G.B.* (2014) 227 Cal.App.4th 1147, 1165–1166 [""'it is only in an extraordinary case that preservation of the parent's rights will prevail over the Legislature's preference for adoptive placement""'"].)

Indeed, Mother's inconsistency as to Daughter's needs were part of what caused the intervention by the dependency court in the first instance. Therefore, Mother's subsequent failure to maintain consistency with Daughter's visitations was a legitimate and lawful concern for the court when making its ruling to terminate parental rights. (See *In re Katherine J.* (2022) 75 Cal.App.5th 303, 309 [a parent's failure "to surmount the issues that initially brought the child into dependency care" can be considered as one factor in the parental-benefit exception analysis].)

Finally, under the third element of *Caden C.*, when "weighing the harm of losing the relationship against the benefits of placement in a new,

adoptive home," we find that the court was plainly conversant with the applicable legal authorities governing its ruling. (See *Caden C.*, *supra*, 11 Cal.5th at p. 640.) The court noted at the start that this was not an "easy case," and the court then engaged in a thoughtful and thorough analysis. In sum, we find that the court did not reach its determination in an arbitrary or capricious manner. (See *In re Stephanie M.* (1994) 7 Cal.4th 295, 318 [noting "when a court has made a custody determination in a dependency proceeding, "'a reviewing court will not disturb that decision unless the trial court has exceeded the limits of legal discretion by making an arbitrary, capricious, or patently absurd determination'"'].)

In sum, we hold that the factual elements of the court's ruling were supported by substantial evidence, and we further hold that the court otherwise did not abuse its discretion when it ruled that the benefit exception to the statutory preference for adoption did not apply. (See *Caden C.*, *supra*, 11 Cal.5th at pp. 640–641 [a juvenile court's determination regarding the parental-benefit exception is reviewed under a hybrid standard of review].)

Mother argues *In re Scott B.* (2010) 188 Cal.App.4th 452 (*Scott B.*), compels a different result. We disagree.

In *Scott B.*, the child was nine years old when he was placed in foster care and 11 years old when the juvenile court terminated his mother's parental rights. The child had lived with his mother his whole life prior to removal. (*Scott B.*, *supra*, 188 Cal.App.4th at p. 471.) He needed special education services, had behavior problems at school, had problems interacting with his peers, and had bladder control issues. (*Id*. at pp. 455–456.) When the child learned he might be adopted, his behavior regressed to growling and biting. (*Id*. at p. 458.) He stated that if his foster parent adopted him, he would run away because he wanted to live with his mother. (*Id*. at p.

14

466.) The appellate court held these reasons were compelling to find that termination of parental rights was detrimental to the child and reversed the juvenile court's order. (*Id*. at pp. 471, 473.)

We find *Scott B.* to be distinguishable. Here, Daughter was three years old when she was placed in foster care, and eight years old at the time the court terminated parental rights. For about five years Daughter had not lived with Mother, and for about three years prior to the section 366.26 hearing, Daughter appeared to have a healthy and loving relationship with her de facto parents. That is, unlike the situation in *Scott B.*, in this case there was ample evidence that Daughter had formed a positive and stable attachment to her prospective adoptive parents. (See also *In re Autumn H.* (1994) 27 Cal.App.4th 567, 576 [the juvenile "court properly concluded no exceptional situation existed to forego adoption"]; *In re A.G.* (2020) 58 Cal.App.5th 973, 995 ["'the parent must show more than frequent and loving contact, an emotional bond with the child, or pleasant visits–the parent must show that he or she occupies a parental role in the life of the child'"].)

To reiterate and conclude, we affirm the court's challenged rulings, which were made at the August 29, 2024, section 366.26 hearing.

## B. *The Indian Child Welfare Act*

The ICWA is a comprehensive federal law concerning the removal of Indian children from their families. (25 U.S.C. § 1901 et seq.) "The court, county welfare department, and the probation department have an affirmative and continuing duty to inquire whether a child for whom a petition under Section 300 . . . may be or has been filed, is or may be an Indian child." (§ 224.2, subd. (a).) A duty of further inquiry is triggered if there is "information suggesting that either the parent of the child or the

15

child is a member or citizen, or may be eligible for membership or citizenship, in an Indian tribe." (§ 224.2, subd. (e)(1).)

"If the court makes a finding that proper and adequate further inquiry and due diligence as required in this section have been conducted and there is no reason to know whether the child is an Indian child, the court may make a finding that the [ICWA] does not apply to the proceedings, subject to reversal based on sufficiency of the evidence." (§ 224.2, subd. (i)(2).)

On August 29, 2024, the court made no required ICWA findings prior to terminating parental rights. On this record, we must conclude that the court erred, and the challenged orders must be conditionally reversed to allow for ICWA compliance. (See *In re L.S.* (2014) 230 Cal.App.4th 1183, 1197 [failure to "determine whether the ICWA applies is prejudicial error"].)

On February 13, 2025, the Agency requested that this court take judicial notice of certain ICWA documents filed *after* the termination of parental rights (Mother opposes the request). The Agency's motion was made several months after the section 366.26 hearing; therefore, we deny the Agency's request for judicial notice. (See *In re Sabrina H.* (2007) 149 Cal.App.4th 1403, 1416 ["Appellate courts rarely accept postjudgment evidence or evidence that is developed after the challenged ruling is made"].)

"Accordingly, we conditionally reverse . . . and remand the matters to allow [the Agency] and the juvenile court to rectify their errors and to take all other necessary corrective actions." (*In re T.G.* (2020) 58 Cal.App.5th 275, 280–281, 298–299 [conditional reversal proper when juvenile court fails to make the findings required under the ICWA].)

16

## III.

## DISPOSITION

The orders terminating parental rights are conditionally reversed. On remand, the court shall conduct further proceedings, as needed, for the limited purpose of ensuring full compliance with the ICWA and related California law. If the court finds, after proper inquiry and notice, that Daughter is not an Indian child as defined by the ICWA, the order terminating parental rights shall be reinstated. Alternatively, if the court determines the ICWA applies, the court shall vacate the order terminating parental rights and conduct further proceedings consistent with the ICWA.


MOORE, ACTING P. J.

WE CONCUR:


SANCHEZ, J.


SCOTT, J.

17