Filed 12/5/25  In re A.Y. CA4/3

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b). This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FOURTH APPELLATE DISTRICT

DIVISION THREE

| | |
|---|---|
| In re A.Y. et al., Persons Coming Under the Juvenile Court Law. | |
| ORANGE COUNTY SOCIAL SERVICES AGENCY, Plaintiff and Respondent, v. A.M., Defendant and Appellant. | G065555 (Super. Ct. Nos. 17DP0725B, 23DP0399) O P I N I O N |

Appeal from an order of the Superior Court of Orange County, June Jee An, Judge. Affirmed.

Liana Serobian, under appointment by the Court of Appeal, for Defendant and Appellant.

Leon J. Page, County Counsel, Debbie Torrez and Chloe R. Maksoudian, Deputy County Counsel, for Plaintiff and Respondent.

No appearance for the Minors.

\*          \*          \*

In April 2023, the Orange County Juvenile Court (the court) issued a protective custody order for then five-year-old A.Y. (Aiden) and one-year-old M.Y. (Malakai). This was based on reported incidents of domestic violence and drug use by their parents A.M. (Mother) and S.Y. (Father). The Orange County Social Services Agency (the Agency) took custody of both children and placed them with K.G. (Godmother), where they remain to this day and appear to be doing well.

The court later terminated the parent's reunification services and set a selection and implementation hearing. (Welf. & Inst. Code, § 366.26.)[1] In April 2025, at the section 366.26 hearing, the court found the children to be adoptable and terminated parental rights. On appeal, Mother claims the court erred by not applying the parental-benefit exception to the statutory preference for adoption. We disagree.

Thus, we affirm the court's order terminating parental rights.

I.

FACTS AND PROCEDURAL BACKGROUND

On March 12, 2023, Mother was driving a car with the two children (Aiden and Malakai) in the backseat and Father in the front seat. Father pushed Mother's face against a window and choked her. Aiden saw this and was frightened. There had been previous reported incidents of domestic violence, and the parents had extensive histories of substance abuse. Father was using fentanyl and methamphetamine. In the parent's home there were marijuana "roaches" within reach of the children. The

---

[1] All further undesignated statutory references are to the Welfare and Institutions Code.

2

parents also had an older son who had previously been adopted after his juvenile dependency case was terminated.

On April 11, 2023, the Agency filed for a petition for a protective custody warrant. The Agency was "concerned that the father may continue to engage in domestic violence against the mother, in the presence of the children. This may result in physical injury and/or emotional trauma (anxiety, nightmares, depression, etc.) to the children." The court issued the warrant, and the two boys were placed with Godmother.

*Jurisdiction and Disposition Proceedings*

On April 13, 2023, the Agency filed a juvenile dependency petition alleging the children were at a substantial risk of serious physical harm. The Agency noted that Aiden "reported witnessing multiple recent incidents of domestic violence including witnessing the father choke the mother in a store, witnessing the mother strike the father with a glass bottle and being present when the father threatened to kill the mother with a gun that the father kept in the home."

On August 14, 2023, the court declared the children to be dependents and removed them from the custody of their parents. The court ordered reunification services to include counseling, a domestic violence program, parenting education, and substance abuse treatment and testing. The court ordered supervised parental visitations with the children.

*Six-Month Review Hearing*

On February 27, 2024, the court conducted a six-month review hearing (it had been continued by stipulation). Prior to the hearing, the Agency filed a status review report, a case plan update, and an addendum

report. The Agency reported that the children were doing well in their placement and Godmother had expressed a willingness to adopt the children should reunification efforts fail. The parents provided limited information about where they were living or their employment status. The parent's compliance with the case plan services was described as "NONE." Mother's visitations were inconsistent. In December 2023, Mother cancelled or failed to appear for each scheduled visitation.

At the conclusion of the hearing, the court adopted the Agency's recommendations, which were that were that the children continue as dependents, and that reunification services continue. Mother and Father were informed "that pursuant to Welfare and Institutions Code Section 366.21(e), if the [children] cannot be returned home by the 12 month permanency hearing, the case may be referred to a Welfare and Institutions Code Section 366.26 hearing that can result in the termination of parental rights and the adoption of the [children]."

*12-Month Permanency Hearing*

On August 20, 2024, the court conducted a 12-month permanency hearing (it had been continued by stipulation). Prior to the hearing, the Agency filed a status report, case plan updates, and addendum reports. The Agency reported that the children continued to do well in their placement. Mother's compliance with the case plan was described as: "MODERATE." Father's compliance with the case plan was described as: "NONE." Mother's participation in substance abuse testing was inconsistent. The Agency noted that during the months of March and April 2024, the parents were consistent in attending visitations, but they were inconsistent in June, July and August.

At the hearing, the court told the parents that "unfortunately, in

4

juvenile dependency proceedings, you're not given an unlimited amount of time in order to reunify with your kids. In no shape or form am I saying that you don't care about your kids or that you don't love your kids. It's just you're up against sometimes a very, very tight timeline . . . ." The court found return of the children to their parents would create substantial risk of detriment to their safety, protection, or physical or emotional well-being. The court adopted the Agency's recommendations, which were to terminate reunification services, and to set the matter for a section 366.26 hearing.[2]

On December 18, 2024, Mother filed a petition to modify the court's orders based on an alleged change of circumstances. (See § 388.) The court set the matter for an evidentiary hearing to be heard concurrent with the section 366.26 hearing.

*Section 366.26 Hearing*

On April 11, 2025, the court began the section 366.26 hearing. A few weeks prior to the start of the hearing, the parents gave birth to another child, Geno, who tested positive for amphetamines and methamphetamines (Geno is not a party to these proceedings). Three witnesses testified over the course of a few weeks.

Prior to the hearing, the Agency reported "the children have been observed to be close to the prospective adoptive parent, seeking her for attention and comfort. The prospective adoptive parent has provided the children with a stable and loving family environment and has been diligent about providing the children with a safe and secure home, and the care that

_____

[2] The court told the parents that although reunification services were "technically" terminated, the Agency would continue to provide the reunification services that were already in place.

5

is consistent with their needs . . . ." The Agency reported that recent supervised visitations with the parents were consistent; however, the parents did "not have stable housing or employment. Despite working toward creating a stable environment, the parents have not addressed the Agency's concern as evidenced by inconsistent drug testing, no current housing stability, and a lack of completion of previous case plan services."

The Agency's social worker testified that she had worked on the case since September 2023. The social worker said Mother was inconsistent with drug testing and visitations, and that the Agency's recommendation was to terminate parental rights because "the children are deserving of permanency." The social worker had concerns regarding the children's safety, noting that Mother wanted the children to have visitations with a relative, despite his prior sustained allegations of abuse. The social worker also had concerns about Mother's current substance abuse given Geno's toxicology results. The social worker testified that recent visitations had been going well, but she opined that the children could not safely be returned to the parent's care. She believed that adoption would be the most appropriate permanent plan for the children.

Mother testified that she completed her case plan. Mother said that she had a close relationship with her children, particularly Aiden. Mother said that her most recent visit with the children had gone well. Mother testified that Godmother had recently cancelled a visitation and "she's been a big distraction in my case."  Mother testified that her visitations never increased and as a result she "felt cheated."

When Aiden testified he was seven years old. Aiden said that he did not want to live with Mother. When asked why, he said: "Because I feel like she's going to leave me alone again." Aiden said that it would be a good

thing to see his mother once a week. When asked why, he said: "Because sometimes I don't want to see her, and sometimes I do." Aiden testified that he feels safe living with Godmother. Aiden said that he would not feel safe living with Mother or Father. When asked if he could choose any person to live with right now for forever and ever, Aiden said he would choose Godmother. Aiden testified that he would choose living with Godmother even if that meant he could not see Mother and Father.

At the conclusion of the hearing, the court found the children to be adoptable and terminated parental rights. The court found no change in circumstances (this ruling is not being appealed). The court also found that the beneficial relationship exception did not apply (the court's analysis will be covered verbatim in the next section of this opinion).

## II.

## DISCUSSION

Mother claims the court erred by not applying the parental-benefit exception to the statutory preference for adoption. We disagree.

In this discussion we will: A) consider the relevant legal principles regarding the parental-benefit exception; B) directly quote the court's ruling at the section 366.26 hearing, and C) analyze whether the court's ruling is consistent with the relevant legal principles.

### A. Relevant Legal Principles

At the section 366.26 hearing, a juvenile court determines a permanent plan for the child, and generally orders adoption, guardianship, or long-term foster care. (*In re J.C.* (2014) 226 Cal.App.4th 503, 528.) "'[T]here is strong preference for adoption over the alternative permanency plans.'" (*In re*

*Anthony B.* (2015) 239 Cal.App.4th 389, 394–395.) Ordinarily, if the juvenile court finds the child adoptable it must then terminate parental rights. (*In re E.T.* (2018) 31 Cal.App.5th 68, 75–76 (*E.T.*).) "'In order to avoid termination of parental rights and adoption, a parent has the burden of proving, by a preponderance of the evidence, that one or more of the statutory exceptions to termination of parental rights . . . apply.'" (*Ibid.*)

Under the parental-benefit exception, a parent is required to show three things: "(1) regular *visitation and contact*, and (2) a *relationship*, the continuation of which would *benefit* the child such that (3) the termination of parental rights would be *detrimental* to the child." (*In re Caden C.* (2021) 11 Cal.5th 614, 631 (*Caden C.*).)

"'"[B]ecause a section 366.26 hearing occurs only after the court has repeatedly found the parent unable to meet the child's needs, it is only in an extraordinary case that preservation of the parent's rights will prevail over the Legislature's preference for adoptive placement."'" (*In re I.E.* (2023) 91 Cal.App.5th 683, 690.)

"The first element—regular visitation and contact—is straightforward. The question is just whether 'parents visit consistently,' taking into account 'the extent permitted by court orders.'" (*Caden C., supra*, 11 Cal.5th at p. 632.) "As to the second element, courts assess whether 'the child would benefit from continuing the relationship.' [Citation.] Again here, the focus is the child. And the relationship may be shaped by a slew of factors, such as '[t]he age of the child, the portion of the child's life spent in the parent's custody, the "positive" or "negative" effect of interaction between parent and child, and the child's particular needs.'" (*Ibid.*) "Concerning the third element—whether 'termination would be detrimental to the child due to' the relationship—the court must decide whether it would be harmful to

the child to sever the relationship and choose adoption." (*Id.* at p. 633.)

As to the first two elements, the substantial evidence standard of review applies. (*Caden C., supra*, 11 Cal.5th at pp. 639–640.) "The determination that the parent has visited and maintained contact with the child 'consistently,' taking into account 'the extent permitted by the court's orders' [citation] is essentially a factual determination. It's likewise essentially a factual determination whether the relationship is such that the child would benefit from continuing it." (*Ibid.*)

"The third element—whether termination of parental rights would be detrimental to the child—is somewhat different. As in assessing visitation and the relationship between parent and child, the court must make a series of factual determinations. These may range from the specific features of the child's relationship with the parent and the harm that would come from losing those specific features to a higher-level conclusion of how harmful in total that loss would be. The court must also determine, for the particular child, how a prospective adoptive placement may offset and even counterbalance those harms. In so doing, it may make explicit or implicit findings ranging from specific benefits related to the child's specific characteristics up to a higher-level conclusion about the benefit of adoption all told. All these factual determinations are properly reviewed for substantial evidence." (*Caden C., supra*, 11 Cal.5th at p. 640.)

"[T]he court must also engage in a delicate balancing of these determinations as part of assessing the likely course of a future situation that's inherently uncertain. The decision . . . require[s] assessing what the child's life would be like in an adoptive home without the parent in his life. [Citation.] The court makes the assessment by weighing the harm of losing the relationship against the benefits of placement in a new, adoptive home.

And so, the ultimate decision—whether termination of parental rights would be detrimental to the child due to the child's relationship with his parent—is discretionary and properly reviewed for abuse of discretion." (*Caden C.*, *supra*, 11 Cal.5th at p. 640.)

"A court abuses its discretion only when ""the trial court has exceeded the limits of legal discretion by making an arbitrary, capricious, or patently absurd determination."" [Citation.] But ""[w]hen two or more inferences can reasonably be deduced from the facts, the reviewing court has no authority to substitute its decision for that of the trial court.""" (*Caden C.*, *supra*, 11 Cal.5th at p. 641.)

"'The reviewing court must . . . draw all reasonable inferences, and resolve all evidentiary conflicts, in a light most favorable to the trial court's ruling.'" (*In re Robert L.* (1993) 21 Cal.App.4th 1057, 1067.) "The reviewing court should interfere only ""if we find under all the evidence, viewed most favorably in support of the trial court's action, no judge could reasonably have made the order that"" was made. (*Ibid.*)

*B. Court Proceedings*

At the conclusion of the section 366.26 hearing, after reviewing the relevant Agency reports, and after listening to evidence and argument, the court ruled (verbatim and in full) as follows:

"Turning now to the .26, I don't believe anyone is disputing that the children, Aiden and Malakai are adoptable, so I am just going to jump straight into the parental-benefit exception.

"So, [Mother], I will explain to you -- and, unfortunately, your attorneys know and are very well aware -- due to recent case law that has come down, outside of your case and in many other cases, the legal burden on

10

the parents remains very steep in dependency cases, especially when we're at a .26, because at each step of the way, along with your case, the burden does shift. It's different when we're still in reunification; it's different once reunification has been terminated; and now at a .26 it is very, very steep, because basically all the Court is looking at is whether or not the children are adoptable. If they are adoptable, then the recommendation is to terminate parental rights, and that is because the legislature has instructed us that the preference is always adoption over legal guardianship.

"That being said, with legal guardianship if parents can demonstrate, what we call, a parental-benefit exception, then the Court should be inclined to grant legal guardianship over the preferred plan of adoption; however, that burden remains very, very steep and very high, and we have been told countless times that it is only to be used in rare circumstances.

"In this case, obviously, we did not have Malakai testify, as he is only age three, and Aiden's testimony I had to go back -- and thank you for allowing me that time to go back and look through my notes -- I do not expect Aiden, at age seven, to understand the gravity of this decision or to understand the difference between adoption and legal guardianship and/or even to grasp not being able to see you or his father moving forward. That is too much for a seven-year-old. In no way is the Court giving the decision to Aiden, for Aiden to choose what the best path is moving forward. That decision does remain with the Court.

"I know much has been made whether or not you and [Father] maintained regular visitation and contact with your children, to the extent visitation was permitted. To that I will say, I know that there were missed visits, canceled visits . . . , you know, lateness showing up to visits; however, I

11

don't think that's what this case really hinges on.

"I know the children have been in this system for over two years. I do show that the last eight months of visits were more regular. I know much was made about, you know, being late to visits. To me, the lateness, the tardiness, that is not, in and of itself alone, an issue; however, I think what it demonstrates is that if you're late to visits -- and I think this happened to [Father] -- the visitations at the visitation center are canceled, then referrals have to be resubmitted, and there's a wait, and there's a delay. It's all of those things combined, in the sense of whether or not you're prioritizing visits with your children.

"Obviously, life happens, people are going to be late, but if you are consistently late beyond, you know, obviously the grace period window and the visitation center marks that, and then after three or five -- I think it differs for each center -- cancels that visitation referral, then we're back at square one. I think that's wherein lies the issue that I have, is whether or not the visits are being prioritized, whether or not you're doing everything in your power to arrive.

"I do understand you are traveling from very far. There was a day where I instructed your attorney for you to just turn around because the ETA for you to arrive at court was going to be something like 3:57 in the afternoon.

"You have been late to court, as were some of my attorneys this morning, but like I said, looking at those things alone, in and of itself, I agree with your attorneys, it's not enough; however, it does go to the larger picture of whether or not you are actively engaging, whether or not you are prioritizing these visits with your children, whether or not demonstrating -- I guess moving forward, whether or not the children are going to be safe. It's not because you're going to miss a doctor's appointment, or you're going to

12

be late to a doctor's appointment, but if you're not on time for the visits and they're not regularly happening, to me, that's probably the reason why the Agency never liberalized your visits; why they never went to unsupervised; why you never started an overnight; why they never were released, at least on this case. I'm not talking about the [earlier] matter [with the other child].

"Parents must show that the child has a substantial positive emotional attachment to the parents, and that the children would benefit from a continuing relationship.

"Malakai has been with [Godmother] for two out of his three years of life; however, Aiden did testify that he loves you both very much; he looks forward to the visits; if he could, he would visit with you seven days a week. The social worker even did testify that when he was not having regular visits with you, it did create harm to him, he was emotionally harmed from not having those visits.

"If this were a question merely of how much you love your children, this Court would never terminate parental rights. I don't think it's a matter of how much you love Aiden and Malaki and Baby Geno; however, it must show that the attachment to you both would be so detrimental that when balanced against being placed in a new adoptive home -- basically the detriment to Aiden and/or Malakai is so great that it's not worth placing them in a permanent adoptive home, and here, per Aiden's own testimony, I cannot find that there is such a grave detriment due to the fact that he very clearly stated that although he enjoys the visits, and although he does want to see you more often, it's more the case, I believe, of friendly visitor.

"At the end, when he was pressed to choose where he would continue to reside, he did choose and say that he wanted to remain with [Godmother]. He enjoys his visits, but he very clearly stated he does not

13

want to live with either you or [Father], and did not feel that Malakai would be safe residing with either one of you.

"I know, per your testimony, that there was an explanation given that you did state you did not leave him alone, and you knew exactly what he was referring to; however, like I have stated, per his own testimony and in his own words, I don't find that severing the parental bond would be detrimental to Aiden at this time.

"Like I said, he is seven. I do not believe he understands the gravity of the decision that the Court is making today; however, I have to base my decision on the facts that I have been presented with at this time and with these children."

*C. Application and Analysis*

Here, under the first element of *Caden C.*, Mother maintained visitations with the children; however, there was substantial evidence in the record to support the court's finding that the visitations were lacking consistency over an extended period of time. (See *Caden C., supra*, 11 Cal.5th at p. 632 ["The question is . . . whether 'parents visit consistently,' taking into account 'the extent permitted by court orders'"].)

Under the second element of *Caden C.*, there was some evidence Mother's relationship with the Aiden and Malakai was to some extent positive. However, the testimony of Aiden at the hearing, and the totality of the evidence in the Agency's reports provides substantial evidence to support the court's ruling that Aiden's relationship with Mother was more akin to a "friendly visitor" rather than as a parent. (See *Caden C., supra*, 11 Cal.5th at p. 632; see also *In re G.B.* (2014) 227 Cal.App.4th 1147, 1165–1166 [""it is only in an extraordinary case that preservation of the parent's rights will

14

prevail over the Legislature's preference for adoptive placement"'"].)

Finally, under the third discretionary element of *Caden C.*, when "weighing the harm of losing the relationship against the benefits of placement in a new, adoptive home," we find that the court was plainly conversant with the applicable legal authorities governing as well as the facts of the case. (*In re D.P.* (2023) 92 Cal.App.5th 1282, 1291 ["Exercises of discretion must be "'grounded in reasoned judgment and guided by legal principles and policies appropriate to the particular matter at issue"'"].)

The court noted at the start of the section 366.26 hearing that it was undisputed that that the children were adoptable; therefore, the focus of the court's analysis had shifted to the needs of the children for permanency and stability. The court then engaged in a thoughtful and thorough analysis of the facts as applied to the appropriate legal considerations. As the court's analysis amply reflects, the court did not reach its decision in an arbitrary or capricious manner. (See *In re Stephanie M.* (1994) 7 Cal.4th 295, 318 [noting "when a court has made a custody determination in a dependency proceeding, "'a reviewing court will not disturb that decision unless the trial court has exceeded the limits of legal discretion by making an arbitrary, capricious, or patently absurd determination"'"].)

In sum, we hold that the factual elements of the court's ruling were supported by substantial evidence, and we further hold that the court otherwise did not abuse its discretion (i.e., the court was not arbitrary or capricious) when it ruled that the parental-benefit exception to the statutory preference for adoption did not apply. (See *Caden C., supra*, 11 Cal.5th at pp. 640–641 [a juvenile court's determination regarding the parental-benefit exception is reviewed under a hybrid standard of review].)

Thus, we affirm the court's order terminating parental rights.

Mother argues that the case of *E.T., supra*, 31 Cal.App.5th 68, compels a different result. We disagree.

In *E.T.*, twin children were removed from Mother's custody when they were four months old. (*E.T., supra*, 31 Cal.App.5th at pp. 70–71.) The children were placed with their godparents. (*Id.* at p. 75.) After over a year of reunification services, the children were returned to Mother. (*Id.* at p. 71.) Mother then experienced a drug relapse, and again lost custody of her twin children, but eventually reunification services were again resumed. (*Ibid.*) The mother thereafter maintained consistent visitations. (*Id.* at p. 73.) At a later section 366.26 hearing, the visitations were described as therapeutic, and it was noted that the children experienced negative behaviors when they were separated from Mother. (*E.T.*, at pp. 73, 76.) The juvenile court terminated parental rights, but the appellate court held that the lower court erred in failing to apply the parental-benefit exception. (*Id.* at p. 77.) The court found that "the visits coupled with Mother's efforts during the dependency showed that the children would benefit from continuing their relationship with her. They love Mother. She provided them comfort and affection, and she was able to ease their fear and anxiety." (*Id.* at p. 76.)

Here, the facts are distinguishable. There was never a period in this proceeding in which the children were returned to Mother's care. Also, there was no evidence in the record that Mother's visits with the children were therapeutic. The children did not experience negative behaviors that were specifically related to their separation from Mother, and it appears that the children adjusted very well to their placement with Godmother. In short, we find the facts and the holding of *E.T.* are inapposite.

Mother also argues that removing her from the children's lives "would cause much detriment to their identity and character, especially

16

Aiden's, and cause him to lose sense of belonging in the world that he has lived with for his entire life." We are not persuaded.

As a reviewing court, we are not an arbiter of facts. And we must generally leave discretionary decisions concerning the "identity and character" of the involved dependent children to the judgment of the court that conducted the section 366.26 hearing. Having found that the court's discretionary ruling was neither arbitrary nor capricious, we have no authority to substitute our judgment for that of the lower court. "'The reviewing court must . . . draw all reasonable inferences, and resolve all evidentiary conflicts, in a light most favorable to the trial court's ruling.'" (*In re Robert L., supra,* 21 Cal.App.4th at p. 1067.)

To reiterate and conclude, we affirm the order of the court, which found that the parental-benefit exception did not apply.

### III.

### DISPOSITION

The challenged order of the juvenile court terminating Mother's parental rights is affirmed.


MOORE, ACTING P. J.

WE CONCUR:


SANCHEZ, J.


SCOTT, J.

17